[Nos. A099987, A102435. First Dist., Div. One. Mar. 24, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
RUBEN GARCIA GONZALEZ et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and II.

**COUNSEL**

Donald R. Tickle for Defendant and Appellant Ruben Garcia Gonzalez.

Patricia L. Watkins for Defendant and Appellant Simon Garcia Gonzalez.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Jamie Michele Weyand, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SWAGER, J.**—We have before us the consolidated appeals of two brothers, Ruben and Simon Gonzalez, who were jointly tried before a jury with other codefendants,[1] and together convicted of conspiracy to transport heroin, cocaine, and methamphetamine for sale, among other target crimes (Pen. Code, § 182; Health & Saf. Code, §§ 11351, 11352, 11378, 11379), possession of heroin for sale (Health & Saf. Code, § 11351), possession of methamphetamine for sale (Health & Saf. Code, § 11378), transportation of heroin for sale to a noncontiguous county (Health & Saf. Code, § 11352), and sale or transportation of heroin (Health & Saf. Code, § 11352), with associated drug quantity enhancements (Health & Saf. Code, § 11370.4; Pen. Code, §§ 1203.07, subd. (a) & 1203.073). Ruben was also separately convicted of possession of a false compartment (Health & Saf. Code, § 11366.8), and misdemeanor child endangerment (Pen. Code, § 273a).

Appellants both argue that the reasonable doubt instruction was not properly clarified by the trial court, and the instruction on jury deliberations was erroneous. Ruben challenges his conviction for use of a false compartment; Simon challenges the finding against him of a weight enhancement. We conclude that the instructions were not flawed, and substantial evidence supports both the false compartment conviction and the weight enhancement finding. We therefore affirm the judgment.

## STATEMENT OF FACTS

On June 19, 2001, a lengthy and extensive narcotics investigation conducted mutually by the Pittsburg Police Department and the Contra Costa County Sheriff's Office Special Investigations Unit culminated in the execution of three search warrants. The first residence searched was the apartment of Ruben and his girlfriend Hortencia Diaz on Lancaster Circle in Bay Point. Present inside the apartment along with Ruben, Hortencia, and their son when the warrant was executed at 7:42 p.m. were Simon, Efrain, and their friend Ernesto Cervantes.

---

[1] One of the codefendants was appellants' brother Efrain Gonzalez, who was ultimately tried separately, as were two other codefendants. To avoid confusion we will refer to appellants Ruben and Simon Gonzalez, and their brother Efrain Gonzalez, by their first names. Efrain's appeal to this court has already been resolved.

Seized from inside the Lancaster Circle apartment were large quantities of heroin and methamphetamine, sugar and other substances used as "cutting agents" for heroin, individual stacks of money on the dining room table in the total amount of $4,487, an electronic money counter, rolls of duct tape and cellophane commonly used to package tar heroin, a balance scale that "could be used to weigh drugs or other items," a "daily planner" with entries of names and numbers that were "possible pay/owe sheets" used to record narcotics transactions, $10,860 in a small safe in the master bedroom, a tow bill for a Ford Thunderbird, a California Department of Motor Vehicles "Certificate of Title" for the vehicle in the name of "Simon Garcia," a driver's license application in Ruben's name, and in a kitchen cabinet drawer a phone bill for the apartment address in the name of Hortencia Diaz, a furniture receipt with Efrain's name "written across the top of it," and a black notebook with "pay/owe sheets" of names and associated dollar amounts. No paraphernalia for personal use of narcotics was found in the residence.

Discovered during a search of Ruben were $1,735 in cash, a piece of paper in his wallet with names and numbers written on it that was another "possible pay/owe sheet," a pager, three Sprint cell phone receipts in his name, and a "Certificate of Title" or "pink slip" to a 1992 Lincoln Continental registered to Salvador Sandoval of Placentia, California. Efrain was found in possession of methamphetamine crystals with a weight of .31 grams, an amount possessed for personal use, wrapped in a $5 bill in his pants pocket, and cash in the amount of $316.21. Seized from Simon's possession were $30 and "Mexican national voter card" or driver's license. Taken from inside the wallet of Ernesto Cervantes was a "torn wire transfer receipt" with his name on it.

At about 9:20 p.m., while the search was still in progress, another friend of appellants, Teofilo Medina, arrived at the apartment. In his pants pocket Medina had 145 grams of heroin, an amount consistent with possession for sale, a pager, and $106. Car keys found in his possession fit a gold Pontiac Fiero that had been very recently parked in the apartment complex parking lot. A search of the Pontiac Fiero uncovered cocaine concealed in the horn cover of the steering column in an amount possessed for sale.

Detective David Zuniga of the Pittsburg Police Department narcotics division offered expert opinion testimony that a "major operation" of narcotics transactions was functioning at the Lancaster Circle apartment, based upon the exceedingly large quantity of drugs and sales paraphernalia seized there. Expert testimony was also adduced that no one who was "uninvolved in your drug dealing business" would be found on the premises where the narcotics and cash were located. Those who run a large-scale drug trafficking enterprise with a great amount of money and drugs present are by necessity a

"tight-knit group" who "do not allow outsiders" to become "involved" for fear of "someone being an informant" or "being ripped off" by other drug users or dealers.

Two other vehicles were seized at the Lancaster Circle apartment complex parking lot: a blue Ford Ranger pickup truck that belonged to Ruben but was registered as a "favor" to Ernesto Cervantes in the name of his girlfriend Maria Fernandez, and a 1992 gold or brown Lincoln Continental that matched the vehicle description in the certificate of title found in Ruben's possession. Discovered in the Ford pickup truck were cash and receipts for moneygrams—that may be associated with drug trafficking—sent on June 18, 2001, in Simon's name to Juan Contreras Arceo and Carmen Arceo in El Monte, California, both in the amount of $2000. Although a trained narcotics detection dog gave an "alert" for the odor of drugs on the left front fender and firewall area of the Lincoln, no contraband was found during a search of the vehicle.

The second search warrant was executed later the same evening at an apartment on Harbor Street in Pittsburg, the residence of Ernesto Cervantes and Maria Fernandez. Only Fernandez and her infant son were present when the search of the apartment was conducted. Although no narcotics were seized from the apartment, "pay/owe sheets" were found. A certified "narcotics detection dog" "alerted on an Igloo Playmate cooler" in the dining room area of the apartment, which indicated a threshold "level of narcotic odor." The dog also subsequently alerted on the interiors of a Honda Civic and a Toyota Tercel, both registered to Fernandez, and parked nearby. No contraband was found in the cooler or the vehicles, but the "nonseizure" alerts indicated to the officer "that there was a narcotic odor there" from previous exposure.

The third search warrant was executed at about 8:30 p.m. at the Delta Auto Wreckers salvage yard business located on a "large piece of property" on Industry Road in Pittsburg that consisted of several buildings with offices and "makeshift bedrooms." The officers entered the business through an unlocked gate and detained many people present on the premises, a few of whom were subsequently arrested.[2] Seized from the offices and a garage or shed on the property were heroin and methamphetamine in large amounts that indicated possession for sale, cutting agents for heroin and methamphetamine, paraphernalia for drug use and sales, and a loaded Taurus .357 revolver. No "indicia" or "paperwork" associated with any of the defendants was found during the search of the premises at Industry Road.

---

[2] None of the people detained or arrested on the Delta Auto Wreckers premises were defendants in this case.

The following afternoon an officer in plain clothes returned to the Industry Road address. He observed an unoccupied blue 1990 Ford Thunderbird parked directly across the street, and "two Hispanic males," later identified as Joe and Salvador Sandoval,[3] leaving the Delta Auto Wreckers premises at the locked main gate. The officer also received information that "just prior to the service of the warrant" the day before at Lancaster Circle "two Hispanic males" left the apartment to enter "an older Ford blue Thunderbird" suspected to be "a delivery car for the narcotics." As the officer approached the two men in his unmarked car they "froze" momentarily, then "appeared to be very nervous" as they crossed the street to the blue Thunderbird parked on Industry Road. As they drove away, Joe and Salvador were "continually watching" the officer as he followed behind them.

After the Thunderbird was detained nearby, Joe and Salvador were arrested. Inside Salvador's wallet was a business card with Ruben's telephone number written on it. By "scrolling" through the "outgoing" numbers on Salvador's cell phone, the officer discovered that he had placed calls to Ruben on the two preceding days. Ruben was also identified as the man who was detained by a deputy of the Contra Costa Sheriff's Department in August of 2000 as he began to enter the driver's door of the same Thunderbird.[4]

The Thunderbird was registered to Salvador at an address in Placentia, California. During a subsequent search, two separate bundles of bills wrapped in clear plastic cellophane, in the total amount of $15,000, were found in a "dead space" behind a speaker mounted on the left rear passenger door. A "small amount" of heroin wrapped in plastic was seized from inside the front driver's side air conditioning vent hidden behind a paper bag. The front air conditioning vents of the Thunderbird had been "modified" to provide "a really nice place to hide contraband" and "diminish the odor" of drugs concealed in the car. A "toggle switch," which is often used to "release an electric compartment" hidden in a vehicle, had been added to the Thunderbird under the steering wheel column.[5] The officer offered the opinion that the Thunderbird had been equipped as a "load car" to "secrete drugs or currency" and "transport drugs from one location to another."

On June 27, 2001, Detective Zuniga displayed four lineups of six photographs each to Sanjay Patel, the proprietor of the Travelodge Hotel in South El Monte. Patel positively identified the photographs of Efrain and Ruben from two of the lineups as two men who stayed in room 201 of the hotel

---

[3] We will also refer to Joe and Salvador Sandoval by their first names.

[4] When he was detained Ruben gave the deputy a false identification which indicated that he was Samuel Garcia of Placentia, California.

[5] The officers did not find that the toggle switch installed in the Thunderbird was connected to anything.

between June 15 and 19, 2001, with another man named Carlos Arceo of El Monte, California.[6] Patel testified at trial that Arceo rented room 201 beginning on June 15. Ruben and Efrain subsequently appeared at the hotel in a "gray colored" 1992 Lincoln Towncar and said they were "staying with Carlos Arceo." The next day, Ruben and Efrain began to pay for the hotel room in cash. After Patel changed a light bulb in the room at the request of the men and ordered pizza for them, they told him "not to come back." Patel did not return to the room, but he observed either Ruben or Efrain working on the Lincoln Towncar in the parking lot with the trunk and the driver's side door open. Patel testified that the trunk liner and the driver's side door panel of the vehicle had been removed. Patel also testified at trial that while Ruben and Efrain occupied room 201 he noticed "constant visitors" to the room during the late night hours. According to Patel, Ruben and Efrain checked out of the hotel before 11:00 a.m. on June 19.

## DISCUSSION

### I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. *The Conviction of Ruben for Use of a False Compartment.*

We turn to appellants' individual challenges to the sufficiency of the evidence, the first of which is Ruben's claim that the prosecution did not prove a violation of Health and Safety Code section 11366.8, as charged against him in count 14.[9] Section 11366.8 prohibits possession, use or control of "a false compartment *with the intent to store, conceal, smuggle, or transport a controlled substance within the false compartment*."[10] Ruben offers a two-pronged argument in opposition to the evidence in support of the conviction of use or possession of a false compartment in violation of section 11366.8: first, that the Ford Thunderbird upon which the conviction was

---

[6] Patel was no longer able to identify Ruben and Efrain at trial, but he testified that when he spoke with Detective Zuniga, gave him descriptions of the men, and made the photo identifications of them, he was truthful and the observations he made were fresh in his mind. Detective Zuniga testified that Patel was "100 percent positive" of his identifications of Ruben and Efrain. Patel agreed at trial that he had no doubt of his previous photo lineup identifications of Ruben and Efrain.

*See footnote, *ante,* page 1405.

[9] All further statutory references are to the Health and Safety Code unless otherwise indicated.

[10] Section 11366.8, subdivision (a), reads: "Every person who possesses, uses, or controls a false compartment with the intent to store, conceal, smuggle, or transport a controlled substance within the false compartment shall be punished by imprisonment in a county jail for a term of imprisonment not to exceed one year or in the state prison."

based was not equipped with a "false compartment" within the meaning of the statute; and second, the evidence fails to show that he used or possessed the Thunderbird.

Our assessment of the evidence to support the conviction is guided by well-defined rules. We "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) "In evaluating the sufficiency of evidence, 'the relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt' [citation], but 'whether " '*any* rational trier of fact' " could have been so persuaded' [citation]." (*People v. Hernandez* (2003) 30 Cal.4th 835, 861 [134 Cal.Rptr.2d 602, 69 P.3d 446].) "The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft, supra,* at p. 1053.) "In that regard, we give great deference to the trial court and resolve all inferences and intendments in favor of the judgment. Similarly, all conflicting evidence will be resolved in favor of the decision." (*People v. Kurey* (2001) 88 Cal.App.4th 840, 848–849 [106 Cal.Rptr.2d 150], fns. omitted.)

We first examine Ruben's contention that the evidence did not prove the essential element of a "false compartment," which is defined in subdivision (d) of section 11366.8 to mean, "any box, container, space, or enclosure that is intended for use or designed for use to conceal, hide, or otherwise prevent discovery of any controlled substance within or attached to a vehicle, including, but not limited to, any of the following: [¶] (1) False, altered, or modified fuel tanks. [¶] (2) Original factory equipment of a vehicle that is modified, altered, or changed. [¶] (3) Compartment, space, or box that is added to, or fabricated, made, or created from, existing compartments, spaces, or boxes within a vehicle." Ruben maintains that "the plain language of the statute requires a change to the 'equipment' of the Thunderbird, not simply placing something in a pre-existing space." He argues that without evidence "the original factory equipment of the Thunderbird had been 'modified, altered, or changed,' " his conviction of a violation of section 11366.8 cannot stand.

His contention calls upon us to interpret the meaning of the term "false compartment" in section 11366.8. "The primary duty of a court when interpreting statutes is to give effect to the clear language of the law, in order to achieve the intent of the Legislature, and effectuate the purpose of the law." (*People v. Kennedy* (2001) 91 Cal.App.4th 288, 293 [110 Cal.Rptr.2d 203].) " 'Our first step [in determining the Legislature's intent] is to scrutinize

the actual words of the statute, giving them a plain and commonsense meaning.' [Citation.]" (*Songstad v. Superior Court* (2001) 93 Cal.App.4th 1202, 1207 [113 Cal.Rptr.2d 729].) "The words are construed in context and harmonized to the extent possible with other statutes relating to the same subject matter." (*People v. Pena* (1999) 74 Cal.App.4th 1078, 1082 [88 Cal.Rptr.2d 656].) " 'If the statutory language is clear and unambiguous, then we need go no further.' [Citation.] If, however, the language supports more than one reasonable construction, we may consider 'a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citation.]" (*People v. Sinohui* (2002) 28 Cal.4th 205, 211–212 [120 Cal.Rptr.2d 783, 47 P.3d 629].)

■ We find nothing in the language of section 11366.8 that requires a modification, fabrication or alteration of the "original factory equipment" of the vehicle, as Ruben asserts. Clearly a "false compartment" is not a space or area in a vehicle that is intended and normally used as a container or storage area, such as a glove compartment, console or trunk. A "false compartment" is, however, a space in a vehicle that is neither designed nor intended for storage or transportation of personal items, but is nevertheless used to conceal controlled substances, even without any modification of the physical configuration of the space.

■ Ruben's claim that proof of a false compartment comes only with evidence of "an addition to" or "a modification of an enclosure" in a vehicle is based upon the three examples listed in section 11366.8, subdivision (d). However, the statute specifies that a false compartment includes but is not limited to those enumerated examples. Use of the language "including, but not limited to" in the statutory definition is a phrase of enlargement rather than limitation. (See *Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1101 [17 Cal.Rptr.2d 594, 847 P.2d 560]; *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639 [268 P.2d 723]; *People v. Kennedy, supra*, 91 Cal.App.4th 288, 293–294.) The preceding, more expansive definition of the term "false compartment" in the statute brings within its scope any other space or enclosure in a vehicle that was not intended for use as a container but has been converted to that purpose to hold and hide controlled substances.
■ The plain language of the statute does not demand evidence of a physical addition to the vehicle or modification of its structure to prove the element of a false compartment.

Ample evidence was presented that the Thunderbird was equipped with false compartments. Heroin was found in an air conditioning vent of the Thunderbird obscured by a paper bag, and a large amount of cash was hidden

in the "dead space" behind a speaker on the left rear door. Neither of those areas was installed in the vehicle or is normally used as a compartment or container. Expert testimony was also received that the air conditioning vent of the car had been "modified" to prevent drugs hidden inside it from falling to the front of the engine, and rags, papers or wrappers had been added to both secrete and mask the odor of any controlled substances. A toggle switch to "release an electric compartment" had been placed under the steering column, although it was not found to be connected to anything. According to further expert testimony, the Thunderbird had been equipped as a "load car" to clandestinely transport drugs and money. The finding of a false compartment intended to conceal controlled substances is supported by substantial evidence.

■ The remaining issue is whether Ruben used, possessed or controlled the false compartments in the Thunderbird. The evidence proved convincingly that Ruben was an active conspirator with his brothers, the Salvadors, and others in a large drug trafficking enterprise that used the Thunderbird in its operation. While proof that Ruben personally used or occupied the Thunderbird was confined to a date at least nine months before the vehicle was seized, he may be liable for use and possession of the false compartments as an aider and abettor, or based upon either actual or constructive possession. (See *People v. Morante* (1999) 20 Cal.4th 403, 417 [84 Cal.Rptr.2d 665, 975 P.2d 1071]; *People v. Rogers* (1971) 5 Cal.3d 129, 134 [95 Cal.Rptr. 601, 486 P.2d 129]; *People v. Francis* (1969) 71 Cal.2d 66, 71–72 [75 Cal.Rptr. 199, 450 P.2d 591]; *People v. King* (2000) 81 Cal.App.4th 472, 478 [96 Cal.Rptr.2d 817]; *People v. Santana* (2000) 80 Cal.App.4th 1194, 1200 [96 Cal.Rptr.2d 158]; *People v. Howard* (1995) 33 Cal.App.4th 1407, 1419–1420 [39 Cal.Rptr.2d 766].) Constructive possession exists where a defendant maintains some control of or right to control the object that is in the actual possession of another, or when his or her dominion and control are exercised through the acts of an agent. (*People v. Morante, supra*, at pp. 417–418.) The doctrine that one may be liable as an aider and abettor "when he or she aids the perpetrator of an offense, knowing of the perpetrator's unlawful purpose and intending, by his or her act of aid, to commit, encourage, or facilitate commission of the offense, 'snares all who intentionally contribute to the accomplishment of a crime in the net of criminal liability defined by the crime, even though the actor does not personally engage in all of the elements of the crime.' [Citation.]" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039 [31 Cal.Rptr.2d 128, 874 P.2d 903].) Aiding and abetting does not require personal participation in the offense, "but merely assistance in committing the offense." (*People v. Morante, supra*, at p. 433; see also *People v. Beeman* (1984) 35 Cal.3d 547, 554–555 [199 Cal.Rptr. 60, 674 P.2d 1318].) Where, as here, the offense is a specific intent crime, " 'the accomplice must "share the specific intent of the perpetrator"; this occurs

when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 [108 Cal.Rptr.2d 385, 24 P.3d 1210], fn. omitted; see also *People v. Coria* (1999) 21 Cal.4th 868, 880 [89 Cal.Rptr.2d 650, 985 P.2d 970]; *People v. Consuegra* (1994) 26 Cal.App.4th 1726, 1731–1732 [32 Cal.Rptr.2d 288].)

■ The record before us shows that just before the warrant was served at Ruben's apartment, two "Hispanic males" were seen walking from there across the street to the parked Thunderbird, which was suspected to be "a delivery car for the narcotics" found in the residence during the search. A large amount of cash and drugs were also hidden inside the Thunderbird when the Sandovals were arrested in the vehicle less than two days later. Salvador was the registered owner of the Thunderbird. He was also found in possession of a business card with Ruben's telephone number on it, and had placed calls to Ruben during the two days before his arrest. A strong and reasonable inference from the evidence is that the false compartments in the Thunderbird were used by Ruben and his coconspirators to conceal controlled substances in the vehicle, in violation of section 11366.8. (See *People v. Santana, supra,* 80 Cal.App.4th 1194, 1200.) The conviction of Ruben for use and possession of a false compartment as an aider and abettor is based upon substantial evidence.

### IV. *The Weight Enhancement Finding.*

We turn to Simon's argument that the evidence does not support the finding of a weight enhancement attached to his conspiracy conviction pursuant to Health and Safety Code section 11370.4, which provides for additional punishment for a conviction of violation of, or of a conspiracy to violate, enumerated drug offenses where the weight of the controlled substance exceeds specified limits. Section 11370.4 further provides in the last paragraph of subdivisions (a) and (b) that "The conspiracy enhancements provided for in this section shall not be imposed unless the trier of fact finds that the defendant conspirator was *substantially involved* in the planning, direction, execution, or financing of the underlying offense." (Italics added.) Simon claims that the evidence fails to prove he was "substantially involved in the conspiracy," as required for imposition of a weight enhancement under section 11370.4. He acknowledges that the jury "could have inferred" his limited participation in the conspiracy, but maintains he was "only tangentially" rather than "substantially involved," and therefore the weight enhancement finding must be reversed.

The "conspiracy enhancements" of section 11370.4 may be imposed "only where the defendant was convicted of conspiracy and the defendant was

substantially involved in the conspiracy." (*People v. Duran* (2001) 94 Cal.App.4th 923, 941 [114 Cal.Rptr.2d 595].) By including the conspiracy offense "with those giving rise to the enhancement, it reasonably can be inferred the Legislature intended to target those individuals who do not possess or have physical contact with the controlled substance." (*People v. Howard, supra,* 33 Cal.App.4th 1407, 1415.)

"A criminal conspiracy exists where it is established that there was an unlawful agreement to commit a crime between two or more people, and an overt act in furtherance of the agreement. (See [Pen. Code,] § 182, subd. (a)(1).)" (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399 [71 Cal.Rptr.2d 487].) " ' "To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of that offense." [Citations.]' [Citation.]" (*People v. Tran* (1996) 47 Cal.App.4th 759, 772 [54 Cal.Rptr.2d 905], italics omitted; see also *People v. Swain* (1996) 12 Cal.4th 593, 600 [49 Cal.Rptr.2d 390, 909 P.2d 994]; *People v. Howard, supra,* 33 Cal.App.4th 1407, 1415.) "In proving a conspiracy, however, it is not necessary to demonstrate that the parties met and actually agreed to undertake the unlawful act or that they had previously arranged a detailed plan. The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. Therefore, conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Prevost, supra,* at p. 1399.) "The agreement in a conspiracy may be shown by . . . conduct of the defendants in mutually carrying out an activity which constitutes a crime." (*People v. Consuegra, supra,* 26 Cal.App.4th 1726, 1734; see also *People v. Superior Court* (*Quinteros*) (1993) 13 Cal.App.4th 12, 20–21 [16 Cal.Rptr.2d 462].) " 'The general test is whether there was "one overall agreement" to perform various functions to achieve the objectives of the conspiracy. . . .' [Citation.]" (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553–554 [110 Cal.Rptr.2d 210].)

 In addition to proof of guilt of conspiracy to possess, transport or sell drugs that exceeded a specified weight, the section 11370.4 enhancement requires the further element that the "defendant was substantially involved in the planning, direction, execution, or financing of the conspiracy and its objective."[11] (*People v. Chevalier* (1997) 60 Cal.App.4th 507, 514–515 [70 Cal.Rptr.2d 482].) Thus, we must find more than the Simon's mere complicity in the conspiracy. We must also find in the record adequate evidence that he played at least an active role in the drug trafficking operation, although we

---

[11] Simon does not contest the additional element that the weight of the drugs he possessed exceeded the specified limit.

conclude that the substantial involvement element does not demand proof that the defendant was a primary or dominant figure in the conspiracy.

Simon was present at Ruben's apartment on June 19, 2001, when a large quantity of methamphetamine, heroin, and cash in separate packages, along with drug sales paraphernalia, were seized at the residence. According to expert testimony, the Lancaster Circle apartment was the site of a "major" narcotics trafficking operation, and would not have been occupied by anyone who lacked a profound connection with the ongoing business of unlawful drug sales. Another coconspirator, Teofilo Medina, arrived at the apartment while the search was in progress with drugs in an amount sufficient for sale in his personal possession and hidden in his Pontiac Fiero parked outside. The evidence also supported the inference that coconspirators Joe and Salvador Sandoval were seen in a dark blue Ford Thunderbird leaving the Lancaster Circle apartment just before the search was conducted. A day later, the Sandovals were arrested in the same Ford Thunderbird, which contained a large amount of bundled cash and heroin when it was seized, and was described by experts as a "load car" for narcotics transactions. Another vehicle associated with the conspirators, the Ford Ranger pickup truck registered to Ernesto Cervantes' girlfriend and found in the Lancaster Circle apartment parking lot when the search was conducted, contained evidence that just the day before Simon twice wired $2,000 to someone named "Arceo" in El Monte, California. A man identified as "Carlos Arceo" of El Monte occupied room 201 at the Travelodge Hotel with Ruben and Efrain between June 15 and 19, 2001, when they were seen working on the Lincoln Towncar, which was described in a condition that indicated it may have also been in operation as a "load car" for the conspirators.[12] The same Lincoln Towncar, apparently registered to Ruben, was seized from the Lancaster Circle apartment parking lot the day the warrant was executed.

 Considered in its entirety, the evidence and the inferences drawn from it establish that Simon was substantially rather than peripherally involved in a large-scale narcotics trafficking venture with his brothers and other co-conspirators. His active participation is demonstrated by evidence that on June 18, 2001, he wired large amounts of money to Arceo, who was associated with Ruben and Efrain at the Travelodge Hotel in South El Monte. The very next day, Ruben and Efrain returned to the Lancaster Circle apartment, where large amounts of drugs and cash were found, thus raising the inference that Simon's wiring of money may have facilitated a drug transaction. And according to expert testimony, Simon's presence at the Lancaster Circle apartment with the coconspirators while drugs and money

---

[12] In addition to the removal of the trunk liner and passenger-side door panel from the Lincoln Towncar observed by Patel, a trained narcotics dog alerted to the front fender and firewall of the vehicle, which suggested that narcotics may have been previously stored there.

were stored there further demonstrates his functional, engaged status in the enterprise. We therefore conclude that the weight enhancement finding is supported by substantial evidence.

## DISPOSITION

Accordingly, the judgment is affirmed.

Marchiano, P. J., and Stein, J., concurred.

Appellants' petitions for review by the Supreme Court were denied June 16, 2004.