Filed 10/3/16  P. v. Clark CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C077036 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F01398) |
| v. | |
| JAKE CLARK, | |
| Defendant and Appellant. | |

Shajia Ayobi devised a plan to kill her husband, Ghulam Ayobi, and offered defendant, Jake Clark, $10,500 to help her commit the murder.[1]  As the Ayobis were returning home from a dinner party, Ghulam was shot in the head.  Shajia called the

---

[1]  Because the victim and his wife have the same surname, we refer to each of them by their first names.

police and tearfully claimed he had been shot by carjackers. A jury found defendant guilty of murdering Ghulam.

On appeal, defendant contends his conviction must be reversed, as there was insufficient evidence to prove he agreed to help commit the murder or did anything to, in fact, help commit the murder. We conclude substantial evidence supports defendant's convictions and affirm the judgment.

FACTUAL BACKGROUND

*The Murder*

In the days before the murder, Shajia repeatedly solicited defendant asking for his help to kill her friend's husband, claiming the husband was molesting and beating his daughter. Initially, she told defendant she planned to put sleeping pills in the victim's food, have someone else pick him up, put him in the car, and dispose of him. Defendant told her he could not help her. Shajia offered him $500 as a down payment and another $10,000 after the murder was completed, for a total of $10,500. Defendant again refused. The next day, Shajia met with defendant and informed him she now wanted to make the murder look like a carjacking. Defendant reiterated he could not help her. She asked if he would at least throw away a bag for her afterward. She told him to be at a specific location at 11:45 p.m. the next day, and she would pay him for his help.

On December 17, 2011, the Ayobis went to dinner at the home of their friends the Araas.[2] While driving home from the dinner party, Ghulam was shot in the head three times at point-blank range. Shajia called 911. She was crying heavily and screaming. She reported, "we were robbed in the car somebody shot my husband." She said she was driving them home and a "[c]ouple of kids" had gotten in the car. At gunpoint, they told her to get on the freeway. Shajia said she heard a male voice from the backseat say,

---

[2]     Except as otherwise noted, date references are to the events that occurred in 2011.

"[G]ive me all your money." Ghulam argued with the man and called him a "nigger." Then Shajia heard multiple shots and a female voice say, "[W]hat the fuck did you do? Why did you do that?" The male told Shajia to pull over on the freeway and the pair got out of the car into another car. Shajia told the dispatcher Ghulam was dying, but was still breathing. It sounded like he was snoring loudly. Ghulam was seated in the passenger seat, a gunshot wound in his head, with blood dripping down his face.

Defendant met Shajia at the designated location at approximately 11:45 p.m.[3] Shajia handed him a bag containing a pistol, two knives, and Ghulam's wallet inside. The pistol smelled like it had been fired. Defendant took the money out of the wallet, and threw the bag into a nearby dumpster.

Ghulam died as a result of the gunshot wounds to his head.

*Police Interviews*

Defendant initially told the police that in December 2011, Shajia told him her friend's husband was abusing her friend and raping her friend's daughter, and she was looking for someone to "take care of" the husband.[4] Shajia offered to pay defendant $10,000 to kill the husband, but he rejected the offer and ended the conversation. He also mentioned Shajia had stopped by the gas station where he worked around that same time, just to talk. Defendant reported on the night of the murder, he got off work between 10:00 and 10:30 p.m. His roommate Kenny Lange picked him up and they stayed at

---

**3**    Defendant claimed on the night of the murder, his roommate picked him up from work and drove them to their apartment complex. Defendant then walked to the apartment of an acquaintance named Kevin approximately one mile away. Defendant gave Kevin samples of marijuana and bought some pills. Kevin's apartment was near the location Shajia had designated, and he happened to leave Kevin's apartment at the same time as Shajia had set. Defendant was shocked and "flabbergasted" to see Shajia speeding towards that location at the designated time.

**4**    This interview occurred on January 20, 2012. Shajia had been arrested for the murder by then.

3

home drinking tequila and smoking cigarettes. He spoke with Shajia on the phone earlier that day regarding a school project.

About a month later, in a second interview with police, defendant added details to the story. He said Shajia first propositioned him on December 15 at a fast food restaurant. He repeated the claim that Shajia said her friend's husband was abusing and raping their daughter and that she offered defendant $10,000 to take care of him. Shajia proposed a plan to drug the husband with sleeping pills, put him in a car, and defendant would dispose of both the car and the body. Defendant again claimed he refused. The next day, Shajia came by the gas station where he worked, said she really needed his help, and again offered to pay him $10,000. Defendant said he could not help her. He said that was the last time he spoke with Shajia before the murder. When confronted with text messages giving Shajia directions to his apartment, defendant admitted she had come to his apartment on December 16 to give him something related to a school project they were working on together. He reiterated that on the day of the murder, he worked until about 10:30 p.m., then went home to his apartment and watched movies with his girlfriend and friends.

In a third interview with police, defendant continued to add details to his version of events.[5] He repeated the information about Shajia first making him the offer at the fast food restaurant to murder her friend's husband for $10,000. He then added that the next day when Shajia came to the gas station, she told him she "really need[ed] this done" and she "already [had] everything." She proceeded to show him a bag containing a gun and two knives. He looked inside the bag and touched the gun. She again offered him a $500 down payment and another $10,000 when the "job" was done. She also had the money with her at the gas station and showed it to him as well. Shajia then said she had changed

---

[5] This interview took place in March 2013. A warrant had issued for defendant's arrest in connection with the murder and he was in custody during the interview.

4

her plan from drugging the husband to faking a carjacking on the way home from a friend's house the following night. Shajia asked if defendant would help her get rid of the murder weapon. Defendant agreed to meet her at a specific location no later than 11:45 p.m. the next day. Defendant, in fact, showed up at the assigned place and time. Shajia arrived. Ghulam was slumped over in the front seat of the vehicle, dead. Shajia gave defendant the bag and $100, slammed the door and drove off. Inside the bag, defendant saw Ghulam's wallet, the gun, which smelled like it had been fired, and the knives. Defendant took the money out of Ghulam's wallet and threw the bag in the dumpster of a nearby apartment complex. Defendant admitted he knew about Shajia's specific plan to commit murder. He knew she was coming to that location to bring him the gun after she committed the murder, and agreed to help her by taking the gun from her after the murder. He characterized his acts as having "conspired with her."

*Other Evidence*

Defendant and Shajia were classmates at Kaplan College, studying criminal justice. In August 2010, Shajia asked another classmate Lucas Jimenez-Porras if he knew where she could get a gun. About six months later, she asked him if he knew someone who could kill a friend's husband. After that conversation, Jimenez-Porras avoided contact with Shajia.

In the summer of 2011, defendant told his friend and classmate Nicholas Westerlund that Shajia had shown defendant a bag with a gun in it and offered him $10,000 to kill someone. Defendant said he rejected the offer. Defendant also told his instructor Randall Fritz that in December 2011 Shajia had asked him to kill her husband for her.

Shajia made two separate cash withdrawals of $5,000 each, one in late November and another on December 16, the day she met with defendant. On December 17 and 18, defendant sent text messages to a friend who worked at a car dealership asking about buying a new car, and what he could get with a $2,500 down payment. Defendant

5

claimed he got this large sum of money from selling approximately four pounds of marijuana for at least $8,000 around December 25. He did not give the police additional information about the drug transaction because the buyer had died.

Also on December 16, the day before the murder, Shajia placed two calls to defendant and defendant returned one of those calls. They text messaged each other, arranged a meeting at defendant's apartment, and defendant gave her his address. Defendant's cell phone records place him near the dinner party around the time of the murder. Shajia's cell phone records demonstrate she did not go to the gas station where defendant worked on December 16, but she did go to his apartment that day. Two days after the murder, Shajia called defendant three more times. In a text message exchange, defendant and Shajia clarified with each other the reason they had gotten together earlier was to discuss school. Defendant claimed the numerous phone calls and text messages between himself and Shajia were about a class project.

On the morning of December 18, an apartment complex maintenance worker found a black canvas bag in a dumpster. Inside the bag was a .32-caliber semiautomatic pistol, a wallet containing Ghulam's identification, latex gloves, a bloody knife, and "flashlight batteries." Tests revealed that the bullets found in the Ayobis' car and recovered from Ghulam's head during his autopsy were shot from the gun retrieved from the dumpster.

Partial DNA profiles on the bag matched defendant, Shajia, and defendant's roommate Kenny Lange. There was also DNA matching Sara Bega, a friend of defendant's roommate who had been to their apartment one time. The bag containing the murder weapon belonged to Lange. Defendant denied giving Shajia the bag.

6

PROCEDURAL HISTORY

An information charged defendant with murder (Pen. Code, § 187, subd. (a))[6] and possession of a firearm by a felon (former § 12021, subd. (a)(1)). As to the murder charge, the information also alleged defendant was armed with a firearm and intentionally and personally discharged a firearm. (§§ 12022, subd. (a)(1), 12022.53, subds. (b)-(d).) A jury found defendant guilty of both counts and found the arming allegation true. The jury found the firearm use and intentional discharge allegations not true. The trial court sentenced defendant to a term of 28 years to life in prison.

DISCUSSION

Defendant contends his murder conviction must be reversed, as there is not sufficient evidence to establish he was the shooter, that he was guilty as an aider or abettor, or that he conspired to commit murder.[7] We disagree.

Under the substantial evidence rule, we review the facts adduced at trial in the light most favorable to the judgment, drawing all inferences in support of the judgment to determine whether there is substantial direct or circumstantial evidence that defendant committed the charged crime. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496.) The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusions. (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) We may not reweigh the evidence and substitute our judgment for the trier of fact; all conflicts in the evidence must be resolved in favor of the judgment. (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.) "Our inquiry on appeal 'in light of the whole record [is] whether any rational trier of fact

---

[6]    Undesignated statutory references are to the Penal Code.

[7]    Because we find sufficient evidence to support defendant's convictions based on derivative liability, we need not address whether there is sufficient evidence that defendant was the direct perpetrator of the murder.

could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] The standard of review is the same when the People rely mainly on circumstantial evidence. [Citations.]" (*People v. Sanchez* (1995) 12 Cal.4th 1, 31-32, italics omitted, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) We find there is substantial evidence to support both a conspiracy and an aiding and abetting theory of liability for first degree murder.

*Aiding and Abetting*

The elements of aider and abettor liability are established upon proof a person, "acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) "When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.]" (*People v. Lee* (2003) 31 Cal.4th 613, 624.) That is, to be guilty of murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing; meaning the aider and abettor must intend to kill. (*Ibid.*) In assessing a defendant's criminal responsibility, the jury may properly consider presence at the scene of the crime, companionship, conduct before and after the offense, and the failure to take action to prevent a crime. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.)

Defendant admitted he knew Shajia's specific purpose was to commit a murder. In repeated conversations with defendant, Shajia detailed her evolving murder plans. By

8

defendant's account, Shajia discussed the murder for hire on three separate occasions. She told him of her final plan to make it appear the victim had been killed during a carjacking and told defendant to meet her at a particular time and place so she could give him the weapon and he could get rid of it. Thus, defendant knew the full nature and scope of Shajia's criminal purpose.

Despite knowing of Shajia's intent to commit murder, rather than distance himself from her, as his classmate Jimenez-Porras had, defendant continued to engage in these conversations with Shajia, with each occasion getting more detailed. Defendant knew when and how the murder was going to take place, yet made no effort to dissuade Shajia from committing the murder nor any effort to contact law enforcement to prevent the murder from happening. Instead, in these discussions with Shajia about the murder, defendant agreed to help her get rid of the murder weapon. In so doing, defendant facilitated the commission of the murder, and encouraged Shajia in committing it, by agreeing to help her dispose of evidence. Based on the DNA evidence, it was also reasonable for the jury to infer that defendant gave Shajia the bag to carry the gun and knives, helped conceal them in Shajia's vehicle so they would be readily available for the murder, and facilitated disposing of them after the murder. Not only did defendant agree, before the murder, to assist Shajia, he actually assisted her in disposing of this evidence. Defendant met Shajia at the assigned rendezvous point, took money out of Ghulam's wallet, and threw the murder weapon away in a dumpster. Taking the money out of the wallet further supported the carjacking cover story. And after the murder, Shajia and defendant discussed a cover story for their repeated conversations and meetings in the days leading up to the murder.

Defendant's agreement to get rid of the murder weapon, presence at the designated time and location to receive the murder weapon and the victim's wallet, effort to dispose of those items, his ongoing relationship with Shajia and continuing conversations about murder plans, their discussions of developing a story to explain their numerous contacts,

9

and his receipt of a large amount of cash shortly after the murder support the inference defendant actually facilitated or encouraged the murder, and intended to do so. Accordingly, there was sufficient evidence to support defendant's conviction based on an aider and abettor theory.

*Conspiracy*

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.) "No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement . . . ." (§ 184.) The agreement may be shown by circumstantial evidence, such as the conduct of the parties in carrying out an activity which constitutes the targeted crime. (*People v. Gonzalez* (2004) 116 Cal.App.4th 1405, 1417, overruled on another point in *People v. Arias* (2008) 45 Cal.4th 169, 182.) It is not necessary to establish "that the parties met and actually agreed to undertake the unlawful act or that they had previously arranged a detailed plan. The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. Therefore, conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399.)

There is no serious question in this case both conspirators committed overt acts in support of their conspiracy. A murder weapon was obtained and used to shoot the victim in the head by one conspirator, amid an agreed pretense of a carjacking and robbery, money was removed from the victim's wallet, and the murder weapon and that wallet were discarded by another conspirator.

10

Shajia earlier sought defendant's help in committing the murder of her husband. She offered defendant $10,500. In the weeks before the murder, Shajia withdrew $5,000 from her bank account. The day before the murder, she withdrew another $5,000. Later that same day, she went to defendant's apartment and showed him the money.

Defendant admitted he knew Shajia intended to commit a murder, and he specifically agreed to help her by getting rid of the murder weapon, which she showed defendant the day before the murder was actually committed. Just after the murder, Shajia and defendant met at the agreed upon location. She returned to him the bag he gave her. It now contained the murder weapon, a gun. It smelled as if it had been fired. Also in the bag were two knives and Ghulam's wallet. Defendant discarded the bag and contents in a dumpster, but only after opening Ghulam's wallet, locating and taking cash from it.

Shortly after the murder, defendant inquired about buying a new car with a down payment of $2,500, and he claimed he had $8,000 in cash, made in a marijuana deal he could not verify. It was reasonable for the jury to infer from the totality of the evidence defendant conspired and agreed with Shajia, in fact, he assisted her in committing the murder and, as promised, received a large sum of money for doing so. Moreover, when Shajia arrived at the predetermined location, defendant saw her husband slumped in the front seat, bleeding. Defendant knew her husband had been shot in the head and was either dead or dying. Yet, he still made no effort to seek medical aid or call law enforcement. When considered in conjunction with the other evidence, it was also reasonable for the jury to infer defendant did not seek medical aid, or call law enforcement, either before or after defendant's husband was shot, because, with knowledge of Shajia's specific intent to murder the victim, he conspired with and agreed to help her commit the murder of her husband. Accordingly, there is sufficient evidence to support defendant's conviction based on a conspiracy theory of liability.

11

DISPOSITION

The judgment is affirmed.

                                    NICHOLSON          , Acting P. J.

We concur:

        MAURO          , J.

        RENNER          , J.

12