[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II. and III. of the Dicussion.
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 850 
OPINION
Appellant John R. Arias was charged by a three-count indictment of the felony offenses of transportation of a controlled substance, methamphetamine (Health Saf. Code, § 11379, subd. (a)[1] — count one), possession of that substance for sale (§ 11378 — count two), and possession of a false compartment (§ 11366.8, subd. (a)— count three). After conviction on all of the charges, appellant was sentenced to the midterm of three years on count one, doubled due to a prior felony conviction (Pen. Code, § 667, subd. (e)(1)); four years on count two, which was stayed (Pen. Code, § 654); and four years on count three, concurrent with the six-year sentence imposed for count one. The court also imposed a one-year enhancement for a prior prison term (Pen. Code, § 667.5, subd. (b)), consecutive to the sentence imposed on the principal count. The total sentence was seven years with 160 days credit for actual time served. *Page 851 
 Appellant claims prosecutorial misconduct, an erroneous instruction on consciousness of guilt, and the erroneous failure to strike a prior prison term pursuant to Penal Code section 667.5. He also raises several issues relating to section 11366.8, which defines the offense of constructing, possessing or using a false compartment with intent to conceal a controlled substance. With respect to that offense, appellant maintains that the evidence is insufficient to sustain his conviction, the trial court gave an erroneous instruction defining a "false compartment," and the statutory definition of a "false compartment" is unconstitutionally vague. In the alternative to his claims relating to section 11366.8, appellant maintains that Penal Code section 654
precludes imposition of punishment on him for commission of that offense.
 We shall reject all of appellant's claims that do not relate to section 11366.8. However, with respect to that offense, we shall sustain appellant's claim of instructional error and related contention that the evidence that he used or possessed a "false compartment" is insufficient to sustain his conviction of violating section 11366.8; those findings make it unnecessary for us to address appellant's other claims relating to section 11366.8.
 FACTS The facts pertinent to the issues presented are as follows: On the evening of May 25, 2005, Martinez Police Officer Nick Voyvodich observed a Lexus without a front license plate and stopped the vehicle for that reason. He asked the driver, appellant, to step out of the car and commenced a search of the vehicle.[2] Officer Voyvodich first examined the fabric-covered area between the front of the sunroof and the metal frame of the car — referred to by the parties as the "headliner" — because he had been told by appellant's former girlfriend "there were things inside." Using Velcro strips attached to the fabric, the officer pulled the headliner down, revealing an interior space. Finding nothing there, he turned his attention to the area beneath the driver's seat, which was also empty. However, while looking at the gap between the dashboard and the steering column, Voyvodich saw plastic baggies containing a white crystalline substance. The baggies were stuffed into a space between the steering column and adjacent wiring located behind the part of the dashboard that would be just above a seated driver's left knee. The dashboard panel "snapped out" and Officer Voyvodich was able to remove it and extricate the baggies. He then handcuffed appellant and searched him, finding cash in three bundles containing $300, $320, and $380, respectively, and an additional loose amount of $425. *Page 852 
 Voyvodich testified that after he informed appellant of his rights pursuant to Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694,86 S.Ct. 1602] and appellant agreed to speak to him, appellant said the drugs were his; he had them for several weeks and planned to throw them away because "[h]e wanted to clean his life up." When asked if the money found on him was obtained from selling drugs, appellant said it was given to him by his uncle, David Morales, who was also his employer, for work of an unspecified nature he was to do for Morales. Appellant said that though the Lexus was registered to his mother he was the only one who drove it.
 A forensic toxicologist testified that the substance found in the three baggies was methamphetamine, and that the baggies weighed 27.72, 23.01, and 3.31 grams respectively. Police Sergeant Gary Peterson, a narcotics expert, testified that appellant possessed the methamphetamine for sale. He explained that a methamphetamine dealer's standard unit of sale is generally one ounce, or 28.5 grams. One of the baggies appellant was found with contained 27.72 grams and the other two baggies together contained 26.32 grams. According to Peterson, drug dealers commonly "chop? off the top" (i.e., take a little for themselves) of the amount they obtain from a supplier. Methamphetamine is commonly sold on the street in "eight balls" (one-eighth of an ounce, or 3.5 grams). Thus Peterson opined that appellant may have received two standard units of methamphetamine from his supplier, taken some for himself, and packaged an "eight-ball" for sale. Peterson believed the money appellant possessed was also indicative of drug dealing. An "eight ball" sells for $110 to $180, so appellant's cash bundles probably indicated three separate sales in quarter-ounce amounts. Finally, Peterson stated that drug dealers often drive cars registered to others, and the fact that appellant did not appear to be under the influence of any drug, and did not possess drug paraphernalia, was also indicative that his possession was for sale.
 George Driscoll, an inspector for the district attorney's office, testified that he interviewed appellant's uncle, David Morales, who employed appellant at his dental lab. Morales told Driscoll he loaned appellant $1,500 so he could pay his bills. Driscoll asked whether he knew anything about appellant starting a business and Morales said he had heard appellant wanted to start a gardening business.
 Morales, the only witness called by the defense other than appellant, testified that he owned the dental lab that employed appellant and paid him $10 an hour for assisting in the fabrication of denture implants. In May 2005, Morales and appellant discussed the prospect of appellant starting his own *Page 853 dental technician business as an independent contractor, so he could also work for other labs and generate additional income. Morales loaned appellant $1,500 so he could purchase the necessary tools and obtain a license. On cross-examination, Morales contradicted Inspector Driscoll's testimony that he (Morales) had heard appellant might start a gardening business. He said he told Driscoll only that appellant did gardening work to make extra money.
 Appellant denied telling Officer Voyvodich that the drugs found in the car were his and had been in the car for a couple of weeks. Appellant said he told Officer Voyvodich that he did not put the drugs where they were found, they were not his, he did not know they were there in the car, and he had no information about them. Appellant said he usually drove a Toyota station wagon, but sometimes used the Lexus, as did his mother, brother, sister and cousins, and during the three months immediately preceding his arrest he had not used the Lexus more than once. He admitted, however, that he had been stopped while driving the Lexus in April 2005, and on two occasions in December 2003, because the car did not have a front license plate. Appellant said that when Voyvodich began accusing him of owning the drugs, he told him that he now lived a respectable life and had "washed my hands completely of all bad stuff," admitting he had been convicted in 1991 of felony grand theft and in 1998 "of a felony involving a crime of moral turpitude."
 Appellant testified that he wanted to go into business for himself as a dental technician and his uncle loaned him $1,500 for that purpose. He cashed the check in that amount his uncle had given him, and received fifteen $100 bills from the bank. He later spent $75 of that money. Appellant agreed to his brother's request to exchange some of his $100 bills for $1,100 in smaller denominations, primarily $20 bills. He put the money in his pocket rather than in a bank because he had previously been a victim of identity theft and was unable to open a bank account.
 On the day he was arrested, appellant was planning to spend the weekend with his girlfriend in San Francisco. He asked his mother if he could use her Lexus because it was nicer than the station wagon he ordinarily used. He had not driven the Lexus for a month or two and knew it was often used by his mother's relatives. When asked, "[d]id you personally do anything to the inside of the Lexus to change or modify any aspect of the inside of it so that you could put drugs in there," appellant answered, "[n]o, my mother would kill me if I did anything like that." Appellant was familiar with the interior *Page 854 area around the sunroof, but never installed Velcro in that area, and had never used or even known there was a compartment behind the headliner. Appellant stated that he had never pulled a panel off the dashboard and was not even aware this could be done.
 Appellant denied offering to give the police information about other drug dealers. On redirect, he stated that the idea of cooperating with the police by informing on drug dealers was not initiated by him but by the officers who interrogated him while he was in detention. He did not have any such information and refused their offer to let him "work off' his case by becoming an informant. On rebuttal, Officer Voyvodich acknowledged that the idea of appellant "working off' his case by informing on others was discussed with appellant. He could not recall whether the subject was brought up by appellant or by any of the police officers present, but appellant did indicate interest in cooperating with the police and Voyvodich referred him to Detective Paul Starzyk. Starzyk testified that Officer Voyvodich asked him to talk to appellant about "working off' a case and he did so in Voyvodich's presence. He said he never threatened appellant or any other accused person to persuade him to become an informer because such an informant would be unreliable and dangerous.
 DISCUSSION
I. Prosecutorial Misconduct
 "A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record" (People v. Frye (1998)18 Cal.4th 894, 971; People v. Anderson (1990) 52 Cal.3d 453, 479
(Anderson); see also People v. Turner (2004) 34 Cal.4th 406, 433), and such conduct is improper even if the district attorney acted in good faith and inadvertently. (People v. Bolton (1979) 23 Cal.3d 208, 213-214;People v. Hill (1998) 17 Cal.4th 800, 822-823.) As the United States Supreme Court has explained, a prosecutor's vouching for the credibility of witnesses creates the danger his or her comments "can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." (United States v. Young (1985) 470 U.S. 1,18-19.) Statements of the prosecutor relating to the credibility of the People's witnesses must consist of "argument from facts in the record directed to the credibility of witnesses, not the personal statement of the prosecutor vouching for their credibility." (People v. Sully (1991)53 Cal.3d 1195, 1235)
 Emphasizing that the trial in this case boiled down to a credibility contest between him and Officer Voyvodich, appellant maintains that the district attorney's bolstering of Voyvodich's testimony — particularly the assertions that appellant admitted the seized drugs belonged to him and he offered to "work off" his case by becoming a police informer — was highly prejudicial, requiring reversal.
 The prosecutorial conduct in question occurred during the district attorney's initial argument to the jury. After describing the police testimony and noting that the testifying officers had no personal relationship with appellant and no motive to lie, the prosecutor stated: "Nothing the officer said has proven to be false. Not a single thing, as opposed to the defendant and his uncle. [¶] And a lying cop is a reckless cop. One lie there, no more career, gone. Out of a job." Defense counsel immediately objected. At a hearing out of the presence of the jury, the court asked the prosecutor to respond to defense counsel's claim that she was vouching for the credibility of her witnesses, all of which were police officers, by claiming they would lose their jobs for lying under oath, which amounted to evidence outside the record. The district attorney replied simply by stating, "I don't believe I was vouching for the officer, I was just stating the obvious." Defense counsel vigorously disputed this statement, noting that it was hardly common knowledge that such police conduct was even investigated or prosecuted, let alone that it invariably resulted in job termination.
 The trial court did not then rule on the objection, deferring its determination until after the jury had retired to deliberate. After hearing from counsel, the trial judge stated his awareness of the impropriety of a prosecutor stating "her personal opinion about the credibility of a witness or to suggest that her office or . . . — the government would have some knowledge as to whether a witness is telling the truth or not." The judge concluded, however, "I don't think the [prosecutor's] argument as phrased in this case went to suggest either of those, or vouch for the officer's credibility beyond arguing that if an officer lies, then it would come back to haunt him in his job. I don't think that qualifies as an appropriate vouching [sic]."[3]
 Appellant maintains that the erroneousness of this ruling is evident, as the statements of the district attorney are materially indistinguishable from those found to constitute misconduct in two recent Ninth Circuit cases, U.S. v. Combs (9th Cir. 2004) 379 F.3d 564 (Combs) and U.S. v. Weatherspoon (9th Cir. 2005) 410 F.3d 1142 (Weatherspoon).
 In Combs, the defendant took the stand and contradicted the testimony of Special Agent Bailey that he had admitted to Bailey that he manufactured methamphetamine at a specific time in the past. The prosecutor repeatedly asked the defendant whether he was saying Bailey was lying and, prompted by the trial judge to respond, the defendant finally answered "Yes, I would say that he lied." (Combs, supra,379 F.3d at p. 567.) In closing argument, the prosecutor referred to this testimony: "The defendant claims Special Agent Bailey is lying. Ask yourselves, ladies and gentlemen, who has the motive to lie here, the defendant or Special Agent Bailey — Special Agent Bailey will get up and go to work on Monday as he has done for the past ten years regardless of the outcome of this case — or the defendant who is facing two felony charges." (Ibid.) Combs's counsel argued in response: "[Law enforcement officials] believed at that time [i.e., August 21, 2001] that they were going to find a clandestine methamphetamine lab in [Combs's machine shop], and when they didn't they were — they had to have tombstones in their eyes, tombstones in their eyes. [¶] . . . [¶] The agents here, their job isn't on the line. No, they aren't going to get fired. You don't get terminated, but you don't keep getting promotions when you go into homes or business establishments after an 18-month investigation and you find nothing. That's not the way to make friends and influence your superiors in the private sector or the government sector." (Id. at pp. 567-568.) In rebuttal, the prosecutor argued: "Most of all, ladies and gentlemen, you have to believe that Special Agent Kent Bailey is a liar. If you believe the defendant's version of events, you have to believe that Special Agent Kent Bailey walked up to that witness stand, swore to tell you the truth, and perjured himself. [¶] You have to believe that Special Agent Kent Bailey flushed his ten-year career down the toilet. For what? For a nice old grandfatherly man. Why would he do that? That makes no sense. Special Agent Bailey may not get fired for participating in a search warrant where there was no meth lab, but you can be darn sure he would get fired for perjuring himself." (Id. at p. 568.)
 Because the defendant failed to object to the prosecution's cross-examination and vouching, the court reviewed his claim on appeal for plain error. To secure reversal under that standard, Combs had to prove "`that: (1) there was "error"; (2) the error was plain; and (3) the error affected "substantial rights." [Citations.] Reversal is proper `only if, viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice.' [Citations.]" (Combs, supra,379 F.3d at pp. 568-569.)
 Noting the government's concession that it was improper for the prosecutor to repeatedly ask the defendant whether he was accusing special agent Bailey of lying, the court concluded "that this error was plain, was compounded by impermissible vouching during closing argument, affected Combs's substantial rights, and seriously affected the fairness and integrity of his trial." (Combs, supra, 379 F.3d at p. 572.) The court reasoned that "the prosecutor compounded the improper cross-examination by arguing that in order to acquit Combs, the jury had to believe that agent Bailey risked losing his job by lying on the stand," which constituted "impermissible vouching." (Id. at p. 574.) As the court observed, the prosecutor "plainly implied that she knew Bailey would be fired for committing perjury and that she believed no reasonable agent in his shoes would take such a risk." (Id. at p. 575.) The court found that "[e]ither the improper questioning in which the district court participated or the improper vouching standing alone would require reversal." (Id. at p. 576, italics added.)
 In Weatherspoon, supra, 410 F.3d 1142, a police officer stopped a vehicle for a traffic violation. Because Weatherspoon had outstanding warrants, he was arrested and the driver consented to a search of the vehicle that led to discovery of a loaded semiautomatic handgun under the front passenger seat. The driver and other passenger provided the police written statements indicating that the weapon belonged to Weatherspoon. However, the driver recanted her statement and the other passenger acknowledged at trial that he provided his statement in consideration for not being arrested on outstanding warrants. (Id. at pp. 1144-1145.) Thus the government's case 10 relied heavily on the testimony of the arresting officers, Kelly and Kent, denying exertion of improper influence over submission of the two witness statements. At the outset of his closing argument, the prosecutor referred to Officer Kelly as a "credible police officer," the defense objected, and the court instructed the prosecutor not to vouch. "Undaunted, the prosecutor returned to the theme of police credibility in his rebuttal, telling the jury that the officers `had no reason to lie in this case or not to tell the truth.' After defense counsel's objection to that statement on vouching grounds was overruled, the prosecutor went even further: [¶] They had no reason to come in here and not tell you the truth. I guess, if you believe Mr. Valladeres [defense counsel], they must have lied at the scene there; they came into this court and they lied to you; they lied to this judge; they lied to me; they lied to my agent, Agent Baltazar. I guess they lied to the dispatcher when they called it in. These are officers that risk losin' their jobs, risk losin' their pension, risk losin' their livelihood. And, on top of that if they come in here and lie, I guess they're riskin' bein' prosecuted for perjury. Doesn't make sense because they came in here and told you the truth, ladies and gentlemen." (Weatherspoon, at p. 1146.)
 The court found the foregoing statement "clearly improper" and reversed the judgment because, as in Combs, the prosecutor "clearly urged that the existence of legal and professional repercussions served to ensure the credibility of the officers' testimony. That suffices for the statement to be considered improper as vouching based upon matters outside the record. . . ."(Weatherspoon, supra, 410 F.3d at p. 1146, citing, as an example, United States v. Boyd (D.C. Cir. 1995) 54 F.3d 868,871-872, collecting cases from various circuits and cited with approval in Combs, supra, 379 F.3d at pp. 574-575.)
 The Attorney General finds it unnecessary to respond to appellant's reliance on Combs and Weatherspoon, claiming "federal cases are not binding on this Court, particularly when there is contrary state authority." According to the Attorney General, the opinion of our Supreme Court in Anderson, supra, 52 Cal.3d 453, provides the dispositive authority and demonstrates the meritlessness of appellant's claim.
 Anderson involved the retrial of a capital murder case in which the jury again found the special circumstance allegation true and returned a death verdict. On appeal, the defendant complained of various instances of prosecutorial misconduct during closing arguments in the penalty phase, one of which was improper vouching. "At one point in her argument, the prosecutor remarked that `A law enforcement officer is no good as a witness if his credibility is in doubt,' and in essence supported the credibility of the officers testifying in this case by noting that `a number of them . . . are old, experienced officers. They've got 15, 20, 22 years of experience on the force.' The prosecutor expressed her doubt that any of them would `jeopardize' his reputation by lying on the witness stand `just to convict one defendant.' The prosecutor continued by noting that defendant, on the other hand, would only be testifying once, rather than a number of times, that he `doesn't have anything else to lose,' and `so what if you do catch him in a few lies?'" (Anderson,supra, 52 Cal.3d at p. 478.) After noting that the defendant failed to object or seek an admonition as to any of the prosecutor's remarks, and therefore could not raise an appellate claim of misconduct (ibid.), the court "[n]onetheless" briefly reviewed the merits of his argument: "The prosecutor is generally precluded from vouching for the credibility of her witnesses, or referring to evidence outside the record to bolster their credibility or attack that of the defendant. [Citations.] In the present case, the prosecutor limited her remarks to facts of record, namely, the years of experience of the officers involved, and her `vouching' was clearly based on inferences reasonably drawn therefrom, rather than on her personal beliefs or knowledge. [Citation.] We find no improper prosecutorial vouching here." (Id. at p. 479.)
 We find nothing in Anderson inconsistent with the reasoning and results reached in the two federal cases appellant relies upon or suggesting that our Supreme Court's attitude about improper vouching differs in any way from that of the federal courts.[4] Furthermore, Anderson is factually distinguishable from this case and those appellant relies upon. The prosecutor in Anderson did not rely solely on the personal representation that a law enforcement officer who lied on the stand was certain to be fired, but primarily on the years of law enforcement experience of the witnesses in question. In the present case, as in Combs and Weatherspoon, the prosecutor did not identify any facts from which the jury could infer the credibility of the police officers who testified, but relied entirely on her own personal knowledge and experience.
 We have little difficulty concluding that the district attorney's vouching for the credibility of the police officers who provided all of the prosecution evidence constituted misconduct. The trial judge, who acknowledged his concern about improper vouching at the time defense counsel objected, should not have deferred ruling on the objection until after the jury retired to deliberate. At that point, a ruling in favor of appellant could not have been cured by an admonition to the prosecutor and jury but would have required the declaration of a mistrial, thus stacking the deck in favor of a ruling for the prosecution. The trial court's tendentious theory that the district attorney's statements did not constitute improper vouching because she merely indicated that "if an officer lies, then it would come back to haunt him in his job," distorts the plain meaning of the words she used.
 We must therefore decide whether the prosecutor's misconduct may have so impaired the jury's ability to judge the evidence fairly that reversal is required. There is no bright-line rule. The probable effect of improper prosecutorial vouching must be assessed in the context of the entire trial. It is impossible to identify all of the considerations that may be relevant in a particular case, but the assessment should generally include the importance of the witness's testimony and prosecutor's vouching to the case overall, whether the vouching fairly and justifiably responded to an attack on the credibility of the witness, the extent to which the nature of vouching implied that that witness's credibility was supported by evidence outside the record, the specificity, timing and general adequacy of any curative instruction or admonition, and the closeness of the case. (See, e.g., United States v. Young, supra,470 U.S. at pp. 18-19; United States v. Necoechea (9th Cir. 1993)986 F.2d 1273, 1278.)
 Though the vouching in this case is similar to that in Combs andWeatherspoon, it is not the same. Unlike Combs, the vouching here did not compound the effect of improper cross-examination in which, with the assistance of the trial judge, the defendant was pressured into accusing the prosecution's witness of lying. Moreover, the improper vouching in that case was considerably more insistent than that here, taking place not just during the prosecutor's opening argument but again during rebuttal. After defense counsel argued that police officers would not be promoted if they failed to produce incriminating evidence after an 18-month investigation, the prosecutor again vouched for the credibility of her witness and at even greater length. (Combs, supra,379 F.3d at pp. 567-568.) The vouching in Weatherspoon was also significantly more intense than that here. "Undaunted" by the trial court's sustaining of the defense objection to improper vouching during his opening argument, and its admonition "not to vouch," the prosecutor returned to the theme of police credibility at even greater length during rebuttal, stating that if the police witnesses lied in court they must also have lied at the scene, to other law enforcement officers, to the judge, and as well to him, and risked prosecution for perjury. (Weatherspoon, supra, 410 F.3d at p. 1146.)
 Another significant difference between this case and Combs,Weatherspoon, and other vouching cases requiring reversal of the judgment, is that the credibility of the People's witnesses was not here the central focus of the People's case. The district attorney's opening and closing statements to the jury focused primarily upon the improbability of appellant's testimony, the extent to which it was "just riddled with lies and inconsistencies," the self-contradictory testimony of Morales, and the strength of the physical evidence, particularly the amount of methamphetamine found. As to appellant, who she claimed "has got a story for everything," the district attorney derided his "fake alligator tears," his "goofy" claim that he was about to throw the drugs away and "turn his life around," the implausibility of the claim he could not put the large amount of cash found on him in a bank because he had been the victim of identity theft he was unable to document, and noted his prior "crime of moral turpitude" that undermined his credibility, and the reasons it would be unreasonable to think the police would want him to become a confidential informant, as appellant claimed. As to appellant's uncle, the prosecutor focused primarily on his hiding his family relationship to appellant, his motive to lie, and the discrepancies between his statements to the police and his testimony at trial, which, according to the district attorney, was disingenuously designed "to fit the defendant's alibi."
 Because the prosecutor's arguments to the jury and the People's case rested far more on these factors than on the credibility of her own witnesses, because her improper vouching for the credibility of those witnesses was so transient, and because the court's instruction that "[s]tatements made by the attorneys during the trial are not evidence," and the jury "must decide all questions of fact in this case from the evidence received in this trial and not from any other source" diminished the possibility that the vouching was consequential, we conclude that appellant's right to be tried solely on the basis of the evidence presented to the jury was not jeopardized and there is no reasonable probability that appellant was prejudiced by the prosecutor's argument.
 II. Consciousness of Guilt*
 The trial court instructed jurors, pursuant to CALJIC No. 2.03, that if they found appellant "made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove consciousness of guilt. However, that statement is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide." This instruction "should never be given unless it can be inferred that the defendant made the false statement for the purpose of deflecting suspicion from himself, as opposed to protecting someone else." (People v. Rankin (1992) 9 Cal.App.4th 430, 436; accord,People v. Louis (1984) 159 Cal.App.3d 156, 160 ["the giving of CALJIC No. 2.03 is justified when there is evidence a defendant fabricated a story to explain his conduct"].[5])
 Appellant claims he made no such false exculpatory statement and the instruction prejudicially "allowed the jury to infer that [he] must have made some type of misleading statement" without an evidentiary basis. He argues that his pretrial statements "are internally consistent and consistent with all evidence except his accuser's testimony," so that an instruction "focusing on [his] consciousness of guilt — where no facts support such consciousness — is unwarranted and highly prejudicial." Thus, appellant concludes, "[t]he court is bound by the overriding rule of law to refrain from instructing the jury on legal principles that are inapplicable and irrelevant to the facts of the case," and the giving of CALJIC No. 2.03 "misdirected the jury as a matter of law and unfairly prejudiced [his] right to due process and a fair trial."
 The People, who see the matter very differently, point out that the giving of CALJIC No. 2.03 is "justified when there exists evidence that the defendant prefabricated a story to explain his conduct" (People v.Edwards (1992) 8 Cal.App.4th 1092, 1103), and that "the falsity of a defendant's pretrial statement may be shown by other evidence even when the pretrial statement is not inconsistent with defendant's testimony at trial." (Ibid.) Furthermore, the People emphasize, "[d]eliberately false statements to the police about matters that are within an arrestee's knowledge and materially relate to his or her guilt or innocence have long been considered cogent evidence of a consciousness of guilt, for they suggest there is no honest explanation for incriminating circumstances." (People v. Williams (2000) 79 Cal.App.4th 1157,1167-1168.) In sum, the People say that CALJIC No. 2.03 does nothing more than advise the jury that a defendant's false pretrial statements may support an inference of his "`"consciousness of some wrongdoing."'" (People v. Ray (1996) 13 Cal.4th 313, 346.) On the basis of these principles, the People claim the instruction was justified by many false statements appellant uttered prior to trial; in particular, they point to Officer Voyvodich's testimony that shortly after appellant was detained he volunteered his awareness of the drugs in the Lexus by declaring he intended to throw them away in a few days, a statement that at trial appellant denied having made. We agree that the evidence justified the challenged instruction.
 Appellant's argument is based on the false premise that evidence of a prior statement cannot provide a basis for giving CALJIC No. 2.03 unless the statement is contrary to the defendant's own trial testimony. The People acknowledge that People v. Morgan (1978) 87 Cal.App.3d 59,67-69, provides support for appellant's theory that unless the falsity of the defendant's prior statement were established by his own testimony consciousness of guilt cannot be inferred from the statement, but correctly point out that the reasoning of Morgan was rejected by the Supreme Court in People v. Kimble (1988) 44 Cal.3d 480, 497-498. It is now settled that, as stated in People v. Edwards, supra,8 Cal.App.4th 1092, "[t]he falsity of a defendant's pretrial statement may be shown by other evidence even when the pretrial statement is notinconsistent with defendant's testimony at trial." (Id. at p. 1103, italics added.) In short, appellant's alleged statement at the scene that he planned to throw the drugs away and other exculpatory statements testified to by Officer Voyvodich justified the giving of CALJIC No. 2.03despite the fact that appellant disputed that evidence. As People v.Kimble makes clear, the instruction allows the jury to disbelieve the prosecution's evidence suggesting that the statement was made or that it was false, and even if the jury decides that the evidence was made and was false, it need not conclude that the defendant deliberately lied to hide his complicity in the crime. (People v. Kimble, at p. 498, fn. 14 [approving the giving of a consciousness of guilt instruction].)
 The giving of CALJIC No. 2.03 was not error.
 III. Failure to Strike Prior Prison Term and Enhancement
 Appellant claims the imposition of a one-year enhancement for a prior prison term pursuant to Penal Code section 667.5 was error because the trial court was unaware of its discretion to dismiss the "prison prior." His argument is predicated on the following statement of the court at the time it imposed the enhancement: "As to the enhancement under section 667.5(b), the law mandates and I find that the People have proven beyond a reasonable doubt that Mr. Arias suffered a prior prison commitment on a felony conviction, and that Mr. Arias did not remain free of prison custody and the commencement or commission of other offenses, felony offenses within the five years of the current offense, and, therefore, under 667.5(b), mandates an [sic] one-year consecutive term in state prison." (Italics added.) Appellant maintains that the court's use of the word "mandates" demonstrates its ignorance of the fact that Penal Code section 1385 grants a trial judge discretion to dismiss prior strikes and enhancements alleged under section 667.5. (See, e.g., People v. Meloney
(2003) 30 Cal.4th 1145, 1155.) We cannot agree that the court's language bespeaks its ignorance of its powers. The record makes clear that the trial judge was fully aware of his discretionary authority to strike the prior at issue but declined to exercise that power.
 On November 10, 2005, prior to sentencing, defense counsel filed a statement in mitigation in appellant's behalf. After noting that the People had alleged a prior strike for voluntary manslaughter and appellant had served a prison term for that offense, the statement asserted that "[t]he court has the authority to strike Mr. Arias'[s] strike and grant him probation," and urged the court to "strike Mr. Arias'[s] strike, grant him probation, and sentence Mr. Arias to the Delancey Street residential program." Two months later, at the sentencing hearing, defense counsel renewed this request. After explaining why appellant and society would benefit if he was placed on probation in a drug rehabilitation program, counsel reiterated that "[t]he court clearly can strike Mr. Arias'[s] strike allegation and make him eligible for probation," and should do so.
 Addressing that request, the court stated: "The first and I think most significant issue I have to decide is whether it is appropriate to strike Mr. Arias'[s] prior felony voluntary manslaughter conviction. [¶] It'sclear that I have the discretion or authority to do so under appropriatecircumstances. However, I do not believe it is appropriate in this case
[¶] [because] Mr. Arias has a rather extensive criminal history. It is a serious criminal history, and the prior is itself extremely serious, and the current offense is extremely serious. [¶] On that basis I don't think it is appropriate for me to strike this voluntary manslaughter conviction prior, and, therefore, the option of probation or the California Rehabilitation Center, even if a good idea, is not legally available to me." (Italics added.)
 The foregoing statements, and others made by the court at the sentencing hearing, make it as clear as could be that the court was fully cognizant of its power to strike the prior. The court's statement that a one-year consecutive sentence was "mandated" obviously refers to the circumstances that rendered it inappropriate to exercise the judicial discretion to strike the prior, not to the absence of judicial authority to do so.
 Appellant's contention that the court erroneously thought it was ruling on a motion to strike a prior felony conviction under Penal Code section 1385 (People v. Superior Court (Romero) (1996) 13 Cal.4th 497), which is subject to a more restrictive test than a motion to strike an enhancement under section 667.5, is untenable. Defense counsel made clear that the motion was made pursuant to section 667.5, and the court referenced that statute. Furthermore, the many reasons the court gave for denying the motion render it impossible to think the court would have granted the motion under the proper test even if, as we do not believe, the court applied a different and higher standard.
 The trial court's denial of the motion to dismiss the prison prior under Penal Code section 667.5 was not error.
IV. Health Safety Code section 11366.8
 Under count three of the indictment, appellant was charged with unlawfully possessing, using, and controlling a "false compartment" with the intent to conceal controlled substances therein in violation of section 11366.8, subdivision (a). Section 11366.8 provides in its entirety as follows:
 "(a) Every person who possesses, uses, or controls a false compartment with the intent to store, conceal, smuggle, or transport a controlled substance within the false compartment shall be punished by imprisonment in a county jail for a term of imprisonment not to exceed one year or in the state prison.
 "(b) Every person who designs, constructs, builds, alters, or fabricates a false compartment for, or installs or attaches a false compartment to, a vehicle with the intent to store, conceal, smuggle, or transport a controlled *Page 855 substance shall be punished by imprisonment in the state prison for 16 months or two or three years.
 "(c) The term `vehicle' means any of the following vehicles without regard to whether the vehicles are private or commercial, including, but not limited to, cars, trucks, buses, aircraft, boats, ships, yachts, and vessels.
 "(d) The term `false compartment' means any box, container, space, or enclosure that is intended for use or designed for use to conceal, hide, or otherwise prevent discovery of any controlled substance within or attached to a vehicle, including, but not limited to, any of the following:
 "(1) False, altered, or modified fuel tanks.
 "(2) Original factory equipment of a vehicle that is modified, altered, or changed.
 "(3) Compartment, space, or box that is added to, or fabricated, made, or created from, existing compartments, spaces, or boxes within a vehicle."
 With respect to the charged violation of subdivision (a) of section 11366.8, the trial court instructed the jury, inter alia, that "[a] false compartment is a space in a vehicle that is neither designed nor intended for storage or transportation of personal items, but is, nevertheless, used to conceal controlled substances even without any modification ofthe physical configuration of the space." (Italics added.) Appellant claims the instruction, particularly the italicized portion, is legally erroneous and was highly prejudicial. The parties agree this instruction was based on the interpretation of the statutory definition of "false compartment" set forth in People v. Gonzalez (2004) 116 Cal.App.4th 1405
[11 Cal.Rptr.3d 434] (Gonzalez); appellant maintains that interpretation is erroneous and the People disagree. As the meaning of a statute is an issue of law, our review is de novo.
 We commence our analysis by examining Gonzalez. The defendants in that case were brothers jointly tried and convicted of various drug offenses and one of whom, Ruben, was separately convicted of possession of a "false compartment" in violation of section 11366.8. (Gonzalez, supra,116 Cal.App.4th at p. 1408.) The facts material to that offense related to the features of the 1990 Ford Thunderbird Ruben was entering when arrested. Ruben maintained "`the plain language of the statute requires a change to the "equipment" of the Thunderbird, not simply placing something in a *Page 856 pre-existing space.' He argues that without evidence `the original factory equipment of the [automobile] had been "modified, altered, or changed,"' his conviction of a violation of section 11366.8 cannot stand." (Id. at p. 1413.) The court rejected this interpretation, finding "nothing in the language of section 11366.8 that requires a modification, fabrication or alteration of the `original factory equipment' of the vehicle, as Ruben asserts. Clearly, a `false compartment' is not a space or area in a vehicle that is intended and normally used as a container or storage area, such as a glove compartment, console or trunk. A `false compartment' is, however, a space in a vehicle that is neither designed nor intended for storage ortransportation of personal items, but is nevertheless used to conceal controlled substances, even without and modification of the physicalconfiguration of the space." (Id. at p. 1414, italics added.) The court was unimpressed with Ruben's reliance on the fact that the three examples of a "false compartment" listed in subdivision (d) of section 11366.8 all refer to a modification, alteration, or change, such as a "[c]ompartment, space, or box that is added to, or fabricated, made, or created from, existing compartments, spaces, or boxes within a vehicle." (§ 11366.8, subd. (d)(3).) The court relied on the fact that "the statute specifies that a false compartment includes but it is not limited to those enumerated examples," and "[u]se of the language `including, but not limited to' in the statutory definition is a phrase of enlargement rather than limitation." (Gonzalez, at p. 1414.) According to the court, "[t]he plain language of the statute does not demand evidence of a physical addition to the vehicle or modification of its structure to prove the element of a false compartment." (Ibid).
 We believe the Gonzalez court misread section 11366.8.
 Preliminarily, it deserves noting that the expansive view of the statute adopted in Gonzalez was wholly unnecessary to sustain Ruben's conviction because there was ample evidence that the original factory equipment of the Thunderbird had been "modified, altered, or changed." (§ 11366.8, subd. (d)(2).) As the opinion explains, the prosecution presented expert testimony that the air conditioning vent of the car "had been `modified' to prevent drugs hidden inside it from falling to the front of the engine, and rags, papers or wrappers had been added to both secrete and mask the odor of any controlled substances. A toggle switch to `release an electric compartment' had been placed under the steering column, although it was not found to be connected to anything. According to further expert testimony, the Thunderbird had been equipped as a `load car' to clandestinely transport drugs and money." (Gonzalez, supra,116 Cal.App.4th at pp. 1414-1415.) We *Page 857 believe Gonzalez was correctly decided, but we also conclude the "more expansive definition of the term `false compartment'" (id. at p. 1414) the court adopted is unjustified by the text of section 11366.8 and inconsistent with its discernible purpose.
 "Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must first look to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]" (Dyna-Med, Inc. v. Fair Employment HousingCom. (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323]; see People v. Kennedy (2001) 91 Cal.App.4th 288, 293 [110 Cal.Rptr.2d 203].) Where, as here, the statute is penal, the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of the words or the construction of the statutory language. (In re Tartar (1959) 52 Cal.2d 250, 256-257 [339 P.2d 553]; 1 Witkin Epstein, Cal. Criminal Law (3d ed. 2000 2007 supp.) Introduction to Crimes, § 24, pp. 51-53 pp. 22-23 supp., and cases there cited.) Though the rule of strict construction has no application to the Penal Code (Pen. Code, § 4), and an appellate court therefore need not "strain" to interpret a penal statute in a defendant's favor where it can fairly discern a contrary legislative purpose, "true ambiguities" in such a statute must be resolved in a defendant's favor. (People v. Avery
(2002) 27 Cal.4th 49, 58 [115 Cal.Rptr.2d 403, 38 P.3d 1].) It is also settled that "if the terms of a statute are by a fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution the statute will be given that meaning, rather than another in conflict with the Constitution. [Citation.]" (People v.Perrine (1975) 47 Cal.App.3d 252, 259 [120 Cal.Rptr. 640].)
 Though the examples of a "false compartment" given in subdivision (d)(1), (2) and (3) of section 11366.8 are in our view a significant legislative indication that a "false compartment" refers only to original factory equipment of a vehicle that has been modified, the most important portion of the provision is the primary definition of a "false compartment," which is "any box, container, space, or enclosure that isintended for use or designed for use *Page 858 to conceal, hide, or otherwise prevent discovery of any controlledsubstance within or attached to a vehicle." (§ 11366.8, subd. (d), italics added.) There is no evidence in this case nor any other reason to think that manufacturers of new vehicles include in their products spaces or enclosures "intended . . . or designed" to be used to conceal or transport controlled substances. The space between the cushions of the back seat of a Chevrolet can undoubtedly be used to hide illegal drugs, but it would be absurd to think General Motors had this in mind when it configured the seating. If the "false compartment" to which section 11366.8 refers need not be shown to have been designed and fabricated by the defendant or someone else for the unlawful purpose of concealing a controlled substance, the statute would provide the basis for a separate felony offense in the majority of the many cases in which drugs not in plain view are found in a vehicle.[6] Neither Gonzalez nor People v.Russell (2000) 81 Cal.App.4th 96 [96 Cal.Rptr.2d 568], the only other published opinion that bears upon the meaning of a "false compartment," applies the statute to an unmodified space designed by the original manufacturer of the vehicle, [7] and such application exceeds that contemplated by the standard jury instructions approved by the Judicial Council in 2006 after trial in this case.[8] *Page 859 
 The only way to construe the statutory definition of a "false compartment" as including an unmodified standard component of a vehicle is to assume that the intent requirement of that definition — i.e., the requirement that the compartment have been "intended for use or designed for use to conceal, hide or otherwise prevent discovery of any controlled substance" (§ 11366.8, subd. (d)) — can be satisfied solely by the intent of the person who uses a space or enclosure to conceal a controlled substance if he or she was not also the designer or fabricator of the space or enclosure used. This assumption is problematical.
 The proposition that the "expansive definition" of "false compartment" set forth in subdivision (d) of section 13366.8 includes a space "not intended for use as a container or storage area" by the designer or fabricator of the enclosed space is not just unsupported by anything in the text of section 13366.8, but creates ambiguity as to whether a "glove compartment, console or trunk," may be a "false compartment" even if modified or altered for the purpose of concealing a controlled substance, because all of those spaces in a vehicle are "intended for use as a container or storage area." Determining whether a compartment is "false" within the meaning of subdivision (d) of section 13366.8 by looking to the intent of the user of the compartment, and deeming it irrelevant whether the designer or fabricator of the compartment intended it to be used to conceal controlled substances, would render the statute so commonly applicable that, as we have said, the Legislature would in that case almost certainly have made its intention clear; at the very least by adding such an illustration to those provided in subdivision (d) of section 11366.8. Where the use of a compartment is clearly not that contemplated by the designer or fabricator of the compartment, it seems to us far more reasonable to determine whether the compartment is "false" for purposes of section 13366.8 by looking to the intent of the designer or fabricator, not that of the user.
 Though we do not believe the statutory definition of a "false compartment" can reasonably be read as including unmodified spaces or enclosures that are standard features of a new vehicle, the text is certainly not as clear as it could be. The residual ambiguity calls for an examination of the legislative history of the statute, to learn whether its purpose may aid in its interpretation. (See 1 Witkin 
Epstein, Cal. Criminal Law, supra, Introduction to Crimes, § 29, pp. 58-59, and cases there cited.)
 The history of section 11366.8 makes clear that the definition of "false compartment" adopted in Gonzalez, supra, 116 Cal.App.4th 1405,1414, and the basis of the jury instruction challenged in this case, is incompatible with the purpose of the statute. *Page 860 
 The Senate Judiciary Committee's analysis of the assembly bill that enacted section 11366.8 — which is among the materials we may consider to discern the legislative purpose (see, e.g., People v. Mills (1978)81 Cal.App.3d 171, 176 [146 Cal.Rptr. 411] [report of Assembly Judiciary Committee]) — commences by noting that, according to the law enforcement agency sponsors of the measure, during the first three months of 1993 "approximately 100 vehicles were interdicted at the California-Mexico border utilizing a variety of fabricated or altered storage compartments or parts in vehicles. The sponsors contend that the proliferation of false compartments in the drug trade is due to an increase in the number of specialized auto shops which manufacture and install such compartments." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1760 (1993-1994 Reg. Sess.) as introduced June 29, 1993, p. 2, identical language is included in Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Assem. Bill No. 1760 (1993-1994 Reg. Sess.) July 8, 1993, p. 2.) The bill's sponsors asserted that "under current law, an auto shop which builds and installs false compartments for the transportation of controlled substances may openly admit their purpose to law enforcement officers and feel secure in the fact that they have violated no law and can not be prosecuted unless they actually possess an illegal controlled substance." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1760, supra, at p. 2.) The history of the bill also indicates "that persons who use secret compartments are major drug dealers and smugglers," as opposed to "casual drug users," and that the impact of the measure would therefore be "minimal" (Assem. Com. On Public Safety, Analysis of Assem. Bill No. 1760 (1993-1994 Reg. Sess.) Apr. 27 1993, p. 2; see also Analysis of Assem. Bill No. 1760 by Youth Adult Correctional Agency, Apr. 6, 1993, at pp. 1, 2 [indicating the bill is "directed toward persons higher on the distribution chain" and "addresses a rather specialized activity"]). This prediction would not be tenable if the measure genuinely embodied the expansive definition of a "false compartment" adopted in Gonzalez. Nothing in the history of the measure that enacted the statute indicates that the Legislature was concerned about the use of spaces or enclosures installed in new vehicles at the factory as standard equipment and never modified, altered, or changed, or that the Legislature ever contemplated that the statute could be applied to such standard spaces or enclosures.
 Based on the text of subdivision (d) of section 11366.8 and the purpose of the provision discernible from its legislative history, we conclude that the instruction that a space or enclosure in a vehicle can constitute a *Page 861 "false compartment" within the meaning of subdivision (a) of section 11366.8 "even without any modification of the physical configuration of the space" misinformed the jury and constituted error. The remaining question is whether the error was prejudicial.
 The place in the Lexus in which the drugs were found was described by Officer Voyvodich. As earlier noted, after searching beneath the driver's seat he saw three baggies containing a white crystalline substance stuffed between the steering column and adjacent wiring behind the lower left part of the dashboard. Voyvodich was able to remove the dashboard paneling that obscured the baggies because it clipped in and out to facilitate access to electrical circuitry located in this part of the vehicle if it needed to be repaired or replaced. The district attorney never asked Officer Voyvodich whether he made any effort to determine whether this space, or any other part of the 1996 Lexus appellant was driving, was standard in that model Lexus or had been modified or altered in any way. Voyvodich addressed this issue only on cross-examination, when defense counsel asked him whether he had ever spoken with any Lexus dealer or Lexus mechanic to ascertain whether the area of the "headliner" in appellant's vehicle was standard in that model Lexus. Voyvodich answered "no," and agreed with counsel's statement that "you personally don't know whether that was a standard feature of this particular model, do you?" Nothing in his testimony suggests Voyvodich made any such inquiry with respect to the different place in the vehicle where the drugs were found. Officer Voyvodich's testimony constitutes the only evidence in the record before us that touches upon whether appellant's vehicle was in all respects a standard 1996 Lexus or had been modified in any way. The record is therefore bereft of any evidence contradicting appellant's vigorous denial that he made any change or modification of the Lexus. Though during her arguments to the jury the prosecutor repeatedly referred to the place where the drugs were found as the "hidden," "secret," or "false compartment," she too never suggested that any space or enclosure in the vehicle had been modified or altered in any way.
 Given the prosecution's failure to make any showing or even claim that the space in which the drugs were found had been modified, the instruction telling the jury that such a space need not have been modified in order to constitute a "false compartment" was highly prejudicial. Moreover, entirely apart from the instructional error, appellant's conviction for using a "false compartment" cannot stand for the independent reason that the evidence is manifestly insufficient to sustain it. *Page 862 
 DISPOSITION The judgment is reversed insofar as it convicts appellant for violation of section 11366.8, subdivision (a). In all other respects, the judgment is affirmed. The four-year concurrent term imposed for violation of section 11366.8, subdivision (a), is stricken and the matter remanded to the trial court for preparation of an amended abstract of judgment.
 Lambden, J., and Richman, J., concurred.
[1] All statutory references are to the Health and Safety Code unless otherwise indicated.
[2] The propriety of the stop and the search are not challenged.
[3] After making his ruling, the trial judge stated that "I overruled the objection at the time [it was made], and I believe it should be overruled." The reporter's transcript does not show that any ruling was made at the time of the objection or at any other time prior to the hearing conducted after the jury commenced its deliberations.
[4] In People v. Padilla (1995) 11 Cal.4th 891, it was claimed that the prosecutor engaged in misconduct warranting reversal by vouching for the credibility of the prosecution's ballistics expert. Responding to a suggestion of defense counsel that the witness had "`made up'" his conclusion that the bullet taken from the victim's body had been fired from a particular weapon, the prosecutor insisted in his closing argument that had he lied, the ballistics expert "would have `risked his whole career of 17 years.'" (Id. at p. 946.) Noting that "the United States Court of Appeals for the Sixth Circuit [had]held a closely similar argument by a prosecutor (asking the jury why a state police officer would `risk his career, 18 years in the state police, to come in here and lie . . .') to be improper" (United States v. Martinez (6th Cir. 1992)981 F.2d 867), the Padilla court expressed "doubt" that the prosecutor's argument in Padilla was proper. (Padilla, at p. 946.) The court rejected the appellant's argument only because it found the vouching not to have been prejudicial. (Ibid.) Padilla thus indicates that our Supreme Court's attitude about prosecutorial vouching is no different from that of the federal courts.
* see footnote, ante, page 848.
[5] People v. Louis, supra, 159 Cal.App.3d 156 was disapproved on a different ground in People v. Mickey (1991) 54 Cal.3d 612, 672, footnote 9.
[6] We do not disagree with the view of the Gonzalez court that the three examples of the statute's application provided in subdivision (d) of section 11366.8 cannot limit its meaning, because the phrase "including, but not limited to" in that provision is a phrase of enlargement. (Gonzalez, supra, 116 Cal.App.4th at p. 1414.) Nevertheless, a definition of "false compartment" that required no modification of original factory equipment would be so consequential that is difficult to think the Legislature would not have provided such an example if that was indeed its intention.
[7] People v. Russell, supra, 81 Cal.App.4th 96 applied the statute to "a locked non-factory-manufactured compartment between the rear seat and trunk wall." (Id. at p. 101.) The only other published opinion we know of that relates to section 11366.8 is People v. Duarte (2007)147 Cal.App.4th 1231, 1234 [55 Cal.Rptr.3d 239], in which the defendant was driving a Chrysler Concorde containing a "hidden compartment" whose provenance was not at issue and is not further described.
[8] Judicial Council of California Criminal Jury Instructions (2006-2007) CALCRIM No. 2441 instructs the jury that "A false compartment is any box, container, space, or enclosure intended or designed to (conceal[,]/hide[,]/[or] [otherwise] prevent discovery of) any controlled substance within or attached to a vehicle. A false compartment may be ((a/an) (false/modified/altered fuel tank[,]/original factory equipment of a vehicle that is (modified/altered/changed)[,]/[or] a compartment, space, or box that is added to, or made or created from, existing compartments, spaces, or boxes within a vehicle)."
The unduly equivocal statement that a false compartment "may be" a modification of original factory equipment apparently reflects the fact that, as acknowledged in the use notes to the instruction, People v.Gonzales, supra, 116 Cal.App.4th 1405, 1414, states that a false compartment does not require modification. It is notable that CALCRIM No. 2441 does not state that proposition; nor does it state or suggest that, as Gonzalez declares, "a `false compartment' is not a space or area in a vehicle that is intended and normally used as a container or storage area, such as a glove compartment, console or trunk." (Gonzales, at p. 1414.) The standard jury instructions previously in use in California, CALJIC, provided no instruction defining the meaning of a "false compartment" as the term is employed in section 11366.8. *Page 863