Filed 7/19/13  In re Jonathan H. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JONATHAN H., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>JONATHAN H.,<br><br>        Defendant and Appellant. | A135972<br><br>(Contra Costa County Super. Ct. No. J1101623) |

A supplemental juvenile wardship petition pursuant to Welfare and Institutions Code section 602 alleged defendant had committed a number of crimes, including conspiracy to commit a robbery (Pen. Code, § 182, subd. (a)(1))[1] and petty theft (§§ 484, 488).  The juvenile court denied defendant's motion to suppress his confession to the police.  At the conclusion of the jurisdictional hearing, the court found true seven allegations of petty theft and one allegation of conspiracy to rob.

On appeal, defendant contends that the juvenile court erred when it denied his motion to exclude his confession to the police because, according to defendant, his confession was coerced and his waiver of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) was not voluntary.  He also maintains that substantial evidence did not support his convictions and that the juvenile court lacked subject matter

---

[1]  All further unspecified code sections refer to the Penal Code.

1

jurisdiction over three of the petty theft convictions. We conclude that substantial evidence did not support the true findings on two of the counts of petty theft but otherwise affirm the jurisdictional and dispositional orders.

## BACKGROUND

On May 3, 2012, a supplemental juvenile wardship petition pursuant to Welfare and Institutions Code section 602 was filed alleging that defendant had committed in count 1, felony conspiracy to rob (§ 182, subd. (a)(1)); in count 2, felony grand theft (§ 487, subd. (a)); in counts 3 through 11, misdemeanor petty theft (§§ 484, 488); in count 12, misdemeanor resisting a peace officer (§ 148, subd. (a)(1)); and in count 13, the unlawful possession of a switchblade knife (§ 653k).

The juvenile court held a contested jurisdictional hearing on June 7, 2011. The evidence at the hearing was that a man was seated in his car in the parking lot across from In-Shape, a health club, shortly before 4:00 a.m. on November 15, 2011, when he spotted two youths in hooded sweatshirts walking in the parking lot. The man observed the boys stand behind a car belonging to the manager of the health club. The boys retreated through the parking lot when another person approached the gym. The man in the car did not see the faces of the two youths.

The police were called and Officer Mike Yaeger arrived at the health club parking lot at 4:08 a.m. Two other officers also responded and they told Yaeger that they had discovered two youths behind the "car wash or gas station," which was about 100 feet from the health club parking lot. Yaeger walked to where the youths were being detained. The youths were defendant and Taylor E. Yaeger found what appeared to be a handgun and a ski mask in the nearby shrubbery. A further search of the shrubs disclosed a Halloween mask of President Barak Obama and an 8-inch carving knife. A closer inspection of the gun revealed that it was an altered rubber Airsoft B.B. gun. The officers searched the boys and found nothing on them. None of the witnesses at the health club was able to identify the youths.

The officers arrested defendant, who was 14 years old at the time. Defendant was in the police station from the time of his arrest at 4:20 a.m., and was interviewed by

2

Detective Peter Folena at 9:03 a.m. Folena was told that defendant had been arrested for a curfew violation and that defendant had been stopped at the health club early that morning. Folena read defendant his *Miranda* rights. Defendant agreed to speak.

Folena's interrogation of defendant in the police station lasted 30 to 45 minutes. Folena did not believe that defendant had eaten anything between the time of his arrest and the interrogation. Folena ended the interview at the station and then, after further questioning while in the car, drove defendant to a fast-food restaurant to have something to eat. The car interview ended at noon or 12:30 p.m.

After the trial court denied defendant's motion to suppress his statements to Folena at the police station, Folena testified that defendant told him he received a phone call from his friend Taylor during the evening of November 14, 2011; they agreed to meet. Defendant snuck out of the house and took his mask of President Obama with him. He met Taylor and Taylor gave him the choice of taking the kitchen knife or an Airsoft B.B. gun; defendant took the B.B. gun.

During the interview, Folena told defendant that he had already talked to Taylor and that he needed defendant to be honest. Folena told defendant that he knew that he had robbed or attempted to rob some individuals and to break into some vehicles. Defendant responded, "Oh, yeah."

Defendant then told Folena that he and Taylor went to a grocery store to steal food. He reported that they hid in the bushes at the rear of the store. They saw an older woman and, while wearing their masks, they followed her to her home. She, however, entered her home and eluded them. They were going to rob another person in the parking lot of the grocery store but their plans were thwarted when an "employee walked by and spooked them."

The boys walked about a mile to a gas station near the health club, In-Shape. They intended to rob individuals, but were unsuccessful. Defendant estimated that they attempted to rob five persons but, for various reasons, failed. Defendant said they were going to rob a female they spotted in the parking lot at In-Shape but they saw the police car enter the parking lot and, thus, they hid in the bushes.

3

Defendant mentioned that he had broken into a grey Honda Civic or Accord earlier in the evening and had stolen a lighter and some cigarettes. Defendant claimed that he had burglarized so many cars since the summer of 2011 that he had lost count; he broke into them to get money.

Folena took defendant in his vehicle to get lunch and to question him further. While driving around the City of Brentwood (Brentwood), defendant showed Folena the cars that he had burglarized. Folena testified during voir dire that defendant did not appear tired when he was driving him around.

As Folena drove around Brentwood, defendant pointed out the following cars as vehicles that he had burglarized: A grey Honda Accord, a silver 2003 BMW, a blue Toyota Tundra, a Dodge Magnum, a Jeep, a Dodge Durango, and a white sedan. Meredith Nahm lived on the street where defendant identified the grey Honda Accord as being a car he burglarized. She stated that her locked Honda had not been burglarized but her unlocked Hyundai Santa Fe had been. Lynnette Torrez lived where defendant identified the BMW that he burglarized. She stated that, in 2011 or early in 2012, her unlocked Yukon was burglarized, but her locked BMW was not burglarized. Eric Yunck resided on the street where the blue Toyota Tundra was located, and he testified that in 2011 his Tundra was burglarized and the backseat television sets had been stolen. James Brandt testified that when he lived on the street where defendant identified the Dodge Magnum, a pack of cigarettes and a cigarette lighter were taken from his Ford Flex in July or August 2011. John Hemenes lived on the street where defendant identified the Jeep that he burglarized, and he asserted that in July 2011, a chrome grenade gear shift knob was removed from his son's Jeep; change was taken from two other vehicles he owned. Joy Scholtz confirmed that in July or August 2011, money was stolen from the ashtray of her Dodge Durango, and that she lived on the street where defendant indicated he had burglarized a Dodge Durango. Steven Padgett lived on the street where defendant identified the white sedan that he had burglarized. Padgett testified that during July or August 2011, his white-topped Suzuki Sidekick was burglarized, and a garage door opener, prescription medication, and a stereo faceplate were stolen.

4

Folena admitted that car burglaries are common in the area where he had driven defendant.

At the conclusion of a jurisdictional hearing, the juvenile court sustained the petition as to seven of the petty theft allegations (counts 3, 4, 5, 8, 9, 10, and 11), and the allegation of conspiracy to rob (count 1). The court granted the People's motion to dismiss the other counts.

On June 21, 2012, at the dispositional hearing, the juvenile court continued defendant as a ward of the court, removed him from the custody of his parents, and ordered him placed at the Orin Allen Youth Rehabilitation Facility.

Defendant filed a timely notice of appeal.

## DISCUSSION

### I. *Voluntariness of Defendant's Confession*

**A.** *The Law and Standard of Review*

Defendant contends the juvenile court erred in denying his motion to suppress his confession. He maintains that his confession was coerced and not voluntary and these same law enforcement techniques made his waiver of his *Miranda* rights involuntary. Defendant asserts the error requires reversal because it was not harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24, and thus violated his constitutional federal and state rights to due process.

"A suspect, having been advised of his *Miranda* rights, may waive them 'provided the waiver is made voluntarily, knowingly and intelligently.' [Citation.]" (*In re Norman H.* (1976) 64 Cal.App.3d 997, 1001.) "In general, a confession is the defendant's declaration of his or her intentional participation in a criminal act. [Citations.] A confession constitutes an acknowledgement of guilt of the crime charged. [Citations.]" (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 208.)

However, " '[i]t long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion. [Citations.] A statement is involuntary [citation] when, among other circumstances, it

5

"was ' "extracted by any sort of threats . . . , [or] obtained by any direct or implied promises, however slight . . . ." ' " [Citations.] Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the "totality of [the] circumstances." [Citations.]' [Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1402.)

" 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.' " (*People v. Williams* (2010) 49 Cal.4th 405, 436.) "The test for determining whether a confession is voluntary is whether the questioned suspect's 'will was overborne at the time he confessed.' [Citation]" (*People v. Cruz* (2008) 44 Cal.4th 636, 669; see also *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.) " 'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citation.]' " (*Cruz,* at p. 669.) In determining whether a minor's confession is voluntary, we consider a number of factors including: the characteristics of the minor, including his or her maturity, education, physical condition, mental health, emotional state, and prior experience with the criminal justice system; and the circumstances of the questioning, including the location, length and continuity of the interrogation and any police coercion, threats, promises of leniency, lies or deception. (*People v. Boyette* (2002) 29 Cal.4th 381, 411; *In re Shawn D., supra,* 20 Cal.App.4th at p. 209.) "Threats, promises, confinement, lack of food or sleep, are all likely to have a more coercive effect on a child than on an adult." (*In re Aven S.* (1991) 1 Cal.App.4th 69, 75.)

" 'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." [Citation.]' [Citation.] [¶] A confession is not involuntary unless the coercive police conduct and the defendant's statement are causally related. [Citations.]" (*People v. Williams*, *supra*, 49 Cal.4th at p. 436.)

6

"We review independently a trial court's determinations as to whether coercive police activity was present and whether the statement was voluntary. [Citation.] We review the trial court's findings as to the circumstances surrounding the confession, including the characteristics of the accused and the details of the interrogation, for substantial evidence. [Citation.] '[T]o the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence.' [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093.)

**B.** *Defendant's Confession and Waiver of Miranda Rights Were Voluntary*

Defendant maintains that his statements in the police station and in the police car were coerced. His confession was coerced, according to defendant, because he is a juvenile and was in the police station for five hours before he was questioned. During that period he did not have the opportunity to call his parents, an attorney, or another adult and had nothing to eat. He was questioned for an additional one to two hours while in the police car. These same factors, defendant maintains, invalidated his waiver of his *Miranda* rights.

The record establishes that defendant was arrested shortly after 4:00 a.m. and then questioned for 30 to 45 minutes just after 9:00 a.m. The record contains no evidence related to the reason for the delay. The second interview in the police car started after 10:00 a.m. and lasted until noon or 12:30. Thus, Folena interviewed defendant for a total of three to four hours after defendant had been in custody for five hours.

Based on the totality of the circumstances, and not one particular fact, we conclude that defendant's admissions were voluntary. Defendant emphasizes that he was young and had limited intelligence as evidenced by his poor grades in school. (See *Gallegos v. Colorado* (1962) 370 U.S. 49, 54 [confession involuntary where 14-year-old was held incommunicado for five days]; *J.D.B. v. North Carolina* (2011) ___ U.S. ___ [131 S.Ct. 2394, 2401-2403] [a juvenile's age plays a role in determining whether a juvenile understands he is free to leave when interrogated by police].)

Although defendant's youth is a factor, his age did not preclude him from understanding and being capable of waiving his rights. (*In re Charles P.* (1982) 134

7

Cal.App.3d 768, 772.) A determination regarding the voluntariness of a confession does not "turn[] on the presence or absence of a single controlling criterion . . . ." (*Schneckloth v. Bustamonte, supra,* 412 U.S. at p. 226.) The court must carefully scrutinize all of the surrounding circumstances. (*Ibid.*) Here, defendant was young, but his extensive involvement with the criminal system, including more than 10 arrests before his current arrest on April 18, 2012, indicated that his *Miranda* waiver was knowing and voluntary. (*People v. Lewis* (2001) 26 Cal.4th 334, 384.)

Furthermore, there is no evidence that defendant's mental condition made it difficult for him to understand the meaning and effect of his confession.[2] Defendant was 14 years old and in the ninth grade. Although the record establishes that he was failing many of his classes at the time of his arrest and had disciplinary problems as well as a high level of truancy, the record does not show that his intelligence is below normal. After his detention on April 18, 2012, defendant earned grades of two C's, two B's, and one A during the third quarter of his school year, and grades of two B's and three A's during the fourth quarter of his school year. Thus, the record shows that defendant's intellectual development is average or above average. Additionally, the record establishes that he has no health issues and was not taking any prescribed medication.

Defendant complains that he was not fed, had to wait five hours in the police station, and was not permitted to call an attorney, his parents, or another adult. (See *Haley v. Ohio* (1948) 332 U.S. 596, 604 (*Haley*).) Moreover, he was then taken in the police car and questioned further for a total interrogation of three to four hours.

We disagree that the circumstances of the interrogation showed coercion. Only one detective questioned defendant, and the initial questioning took only about 45 minutes. The questioning in the car was longer, but this questioning for an additional two or two and one-half hours was not unduly long; defendant points to no evidence indicating that he was fatigued. (Cf. *People v. Alfieri* (1979) 95 Cal.App.3d 533, 537,

---

**2** Defendant does not argue that he did not understand his *Miranda* rights, but argues that his waiver was involuntary for the same reasons that his confession was involuntary.

8

545 [confession of a 17-year-old youth with borderline intelligence and subsequently psychiatrically diagnosed as highly suggestible after being in custody for 36 hours and interrogated for 20 hours was involuntary].) Folena did not threaten defendant and there were no express or implied promises that would make defendant think that, if he confessed, he would receive more beneficial treatment. Folena did not lie to defendant. The record contains no evidence of any intimidating behavior by Folena. Defendant did not eat until noon, but there was no evidence that defendant was hungry earlier or asked for food. Folena testified that defendant did not appear fatigued when he was in the car.

The present case differs significantly from the cases cited by defendant. (*Haley*, *supra*, 332 U.S. 596; *Crane v. Kentucky* (1986) 476 U.S. 683 (*Crane*).) In *Haley,* the United States Supreme Court held that a 15-year-old's confession was not voluntary when he had been questioned for five straight hours—from midnight to 5:00 a.m.—by five or six officers working in relays and was not advised of his right to remain silent or the right to an attorney until after he confessed. (*Haley*, at pp. 598, 600-601.) After his confession, he was not permitted to see an attorney for three days and his mother for five days. (*Id.* at p. 598.) In contrast, here, the interrogation was by a single officer and did not last five hours; rather defendant had to wait five hours until he was interrogated. Additionally, defendant was provided his *Miranda* rights at the very beginning of his interrogation.

*Crane*, *supra*, 476 U.S. 683, another case cited by defendant with almost no analysis, is also unavailing. The present case is not legally or factually similar to *Crane*. In *Crane,* a 16-year-old defendant testified at a pretrial motion to suppress that he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession. (*Id.* at p. 691.) At trial, the court would not permit the defendant to present evidence about the duration and physical circumstances of the confession, ruling that the evidence was relevant only to the legal issue of voluntariness. (*Id.* at p. 686.) The United States Supreme Court held that the

9

trial court erred in excluding "testimony about the environment in which the police secured his confession" as this evidence was related to the reliability of the confession and could be an integral part of the defense. (*Id.* at p. 691.)

In the present case, unlike the situation in *Crane*, *supra*, 476 U.S. 683, the court heard the evidence regarding the circumstances of defendant's confession. Furthermore, as already discussed, the record does not contain evidence of coercion. There is no evidence that defendant asked to call anyone and only one officer, not multiple officers, interrogated him. Furthermore, his actual interrogation was not for a protracted period of time.

Defendant complains that he was not able to call his parents, another adult, or his attorney. Defendant did not request to speak to an attorney. The record also lacks any evidence indicating that he ever asked to speak to his parents or that an officer told him that he could not speak to his parents.[3] In any event, courts have declined to impose a requirement that police advise minors of a right to speak with parents or to have a parent present during questioning. (*In re Aven S., supra,* 1 Cal.App.4th at p. 76; *In re John S.* (1988) 199 Cal.App.3d 441, 445-446.)

Defendant cites no evidence in the record suggesting that the wait in the police station caused him stress or that the delay was unreasonable, unnecessary, or for the purpose of overcoming his free will. (See, e.g., *United States v. Valenzuela-Espinoza* (9th Cir. 2012) 697 F.3d 742, 745, 751-752 [under the federal presentment rule, defendant must be brought before a magistrate within six hours of arrest and confessions in violation of this rule must be suppressed *if the delay was unreasonable*].) Nothing in the record indicates that defendant suffered any adverse impact as a result of this wait.

---

[3] In his reply brief, defendant argues that the police were required to notify his parents about his detention and to inform him of his right to call them under Welfare and Institutions Code section 627. The record is silent as to whether the officers complied with Welfare and Institutions Code section 627. Even if the officers did not notify defendant's parents as required by this statute, California law, as defendant acknowledges, does not allow suppression of the confession as a remedy for violation of this statute. (See *People v. Lessie* (2010) 47 Cal.4th 1152, 1169.)

10

There is no evidence that defendant was emotionally distraught, anxious, mentally fatigued, or physically fatigued during the interview. Nothing in the record suggests that defendant's will was overborne and there is no evidence that Folena was aggressive or domineering.

Accordingly, we conclude that the juvenile court did not err in finding that the prosecution demonstrated by a preponderance of the evidence that defendant's confession and waiver of his *Miranda* rights were voluntary.

## II. *Sufficiency of the Evidence*

### A. *Standard of Review*

Defendant argues that insufficient evidence supported the juvenile court's findings that he conspired to commit robbery. He also asserts that insufficient evidence supported six of the seven petty theft allegations that the juvenile court found were true.

The standard of proof in juvenile court proceedings involving criminal activity is the same as in adult criminal trials. (*People v. Nguyen* (2009) 46 Cal.4th 1007, 1022.) The People must prove beyond a reasonable doubt that the minor committed the offenses alleged in the Welfare and Institutions Code section 602 petition. (*Nguyen*, at p. 1022.)

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury [or trier of fact] reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

**B.** *Conspiracy to Commit Robbery*

"Conspiracy is an inchoate crime. [Citation.] It does not require the commission of the substantive offense that is the object of the conspiracy. [Citation.] 'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime,' and 'thus reaches further back into preparatory conduct than attempt . . . .' " (*People v. Swain* (1996) 12 Cal.4th 593, 599-600.)

"The crime of conspiracy is defined in the Penal Code as 'two or more persons conspir[ing]' '[t]o commit any crime,' together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance thereof. (. . . §§ 182, subd. (a)(1), 184.) 'Conspiracy is a "specific intent" crime. . . . The specific intent required divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of that offense.' [Citation.]" (*People v. Swain, supra,* 12 Cal.4th at p. 600, italics omitted.)

The target offense in the present case is robbery. "The elements of robbery are (1) a taking of personal property, (2) from the person or immediate presence of another, (3) through the use of force or fear, (4) with an intent to permanently deprive the owner of his property." (*People v. Kelley* (1990) 220 Cal.App.3d 1358, 1366.)

Defendant maintains that the juvenile court should not have found that he conspired to rob because the evidence did not establish that he had the specific intent to commit robbery. He maintains that no witness identified him and his admissions showed that he changed his mind about robbing any person before attempting any robbery. He asserts that his conduct demonstrated that he and his friend really did not intend to rob anyone.

Contrary to defendant's argument, sufficient evidence established conspiracy to commit robbery. The prosecution did not have to prove attempt (see, e.g., *People v. Swain, supra,* 12 Cal.4th at pp. 599-600), as defendant seems to suggest. " '[C]onspiracy

12

may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Gonzalez* (2004) 116 Cal.App.4th 1405, 1417, disapproved on other grounds in *People v. Arias* (2008) 45 Cal.4th 169, 182.) The conduct of defendant and Taylor supported the inference that defendant and Taylor conspired to rob individuals outside the grocery store and in the parking lots of the gas station and health club. Defendant and Taylor had masks, a B.B. gun, and a knife, and hid in the bushes at the rear of the grocery store. They did not actually rob any person, not, as defendant asserts, because they had changed their minds about committing a robbery, but because they were unsuccessful or an event or person *temporarily* thwarted their attempts. They changed their minds about robbing a particular individual, but they never abandoned their plans to rob someone. They were unsuccessful in robbing an older woman at the grocery store because she was able to get into her residence before they were able to rob her and they decided not to rob another person in the parking lot of the grocery store because an "employee walked by and spooked them." At that point, they did not cast aside their desire to rob someone; rather, they went to the parking lot of In-Shape in search of a victim to rob. They were deterred and remained hidden in the bushes only because they saw a police car enter the parking lot.

"Withdrawal from a conspiracy requires 'an affirmative and bona fide rejection or repudiation of the conspiracy, communicated to the coconspirators. [Citations.]' " (*People v. Sconce* (1991) 228 Cal.App.3d 693, 701, quoting *People v. Crosby* (1962) 58 Cal.2d 713, 730-731.) Here, defendant and Taylor never disavowed their plans to rob a person.

As already noted, on appeal all inferences are drawn in favor of the judgment. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) The evidence in the record establishes that defendant and Taylor had masks to conceal their identities and had a B.B. gun and knife. Based on their mutual agreement they intended to rob people, and orchestrated their plan for doing so. They did not actually attempt to rob any person, not because they

13

abandoned their plan to rob someone, but because an event or situation deterred or scared them from robbing the targeted individual.

## C. *Petty Theft*

The juvenile court found that defendant committed seven counts of petty theft. The elements of petty theft are the following:  "(1) the defendant took possession of personal property owned by someone else; (2) the defendant did so without the owner's consent; (3) when the defendant took the property, he or she intended to deprive the owner of it permanently; and (4) the defendant moved the property, even a small distance, and kept it for any period of time, however brief." (*People v. Catley* (2007) 148 Cal.App.4th 500, 505.)

Defendant challenges the juvenile court's findings of petty theft on counts 3, 5, 8, 9, 10, and 11; he does not challenge the finding of petty theft on count 4.

Defendant argues that the record contains no evidence that he burglarized Torrez's white Yukon (count 3).  Defendant never admitted to breaking into a white Yukon, and the items reported missing did not match the items defendant stated that he took.

Defendant told Folena that he burglarized a silver BMW on Madrone Place in Brentwood.  He told Folena that he stole "some Hot Cheetos, sour patch kids, and cigarettes."  Torrez testified that she lived on Madrone Place and owned a BMW.  She, however, stated that her BMW was not burglarized.  Her unlocked Yukon was burglarized in late 2011 or early 2012, and a DVD player, TV screens, and loose change were removed.

We agree that this evidence was insufficient to support an inference that defendant stole the electronic equipment and cash from the white Yukon.  The record does not contain evidence "that is reasonable, credible, and of solid value" from which "a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)  Defendant's statements to Folena about the burglary of the BMW on Madrone Place did not match Torrez's testimony that her white Yukon had been burglarized.

Defendant also challenges the finding on count 10 that he burglarized the blue Toyota Tundra that belonged to Yunck. Folena drove defendant on Surrey Way in Brentwood, and defendant told him that he removed small televisions that were mounted on the rear of the headrests in the Toyota Tundra. Yunck testified that his black Tundra had been parked in the driveway of his residence on Surrey Way in 2011 when it was burglarized. He explained that several televisions for a car were taken out of the vehicle, as well as cables.

Defendant argues that the evidence regarding the burglary of the Toyota Tundra was insufficient because of the discrepancy in the color of the car and the vagueness regarding the time of the theft. We conclude that the evidence regarding count 10 was sufficient. Defendant admitted removing the televisions from the vehicle and may not have remembered also removing cables. Defendant identified the make of the vehicle. Given that defendant said he burglarized cars in the early-morning hours the juvenile court could infer that defendant was unable to distinguish between a blue and black vehicle in the darkness. Solid, credible evidence linked defendant to the burglary as he admitted removing portable television sets from a Toyota Tundra parked on Surrey Way and the owner confirmed that during the period defendant admitted he was burglarizing vehicles, his Toyota Tundra parked on Surrey Way was burglarized and portable televisions, among other smaller items, were removed.

The juvenile court found that defendant burglarized the Hyundai Santa Fe owned by Nahm (count 5). Defendant contends that the evidence did not support this finding as he did not claim to have burglarized a Hyundai Santa Fe, and the record contained no evidence connecting him to that crime.

The record indicates that defendant identified a grey Honda Accord that was parked on Woodsong Lane as a vehicle that he burglarized. He could not remember whether he removed anything from the vehicle. Nahm, who lived on Woodsong Lane, testified that she owned a grey Honda Accord, but it had not been burglarized. Her Hyundai Santa Fe was burglarized and a navigator system, sunglasses, and a sunglass case had been removed.

15

We agree the record lacks reasonable and credible evidence that defendant burglarized the Hyundai Santa Fe.  The People argue that defendant was simply mistaken that he burglarized the Honda, but had actually burglarized the Hyundai.  The mere fact that defendant was burglarizing cars on Woodsong Lane in 2011 is not sufficient evidence to prove that he burglarized the Hyundai Santa Fe when there is no reliable evidence connecting him to the burglary of that vehicle.

The juvenile court found that defendant burglarized a Dodge Magnum that belonged to Brandt (count 8).  Folena testified that defendant told him that he removed $70, cigarettes, and a lighter from a Dodge Magnum on Sarah Street.  Brandt testified that he lived on Sarah Street and that a pack of cigarettes, a cigarette lighter, and $60 in a white envelope, as well as possibly other loose dollar bills in the center console were removed from his Ford Flex.  Defendant admits that the address of the burglarized car and the items removed from the car matched the statements he made to Folena, but he claims the evidence was insufficient because he said he burglarized a Dodge Magnum and Brandt stated that his Ford Flex was burglarized in July or August 2011.

We conclude that the evidence supported a finding of petty theft on count 8.  Defendant may not have remembered the make of the vehicle correctly, but he recalled that he removed specific items from a vehicle on Sarah Street.  Brandt's testimony adequately matched defendant's testimony to provide sufficient, credible evidence in support of the trial court's finding.

Defendant also challenges the finding that he burglarized the Suzuki Sidekick that belonged to Padgett (count 9).  Defendant told Folena that he burglarized a white sedan on Rosegate Drive and that he removed pills and a garage door opener.  Padgett testified that he lived on Rosegate Drive and that a garage door remote, prescription medication, and a faceplate for a stereo were removed from his white-topped Suzuki Sidekick in July or August 2011.  Here, Padgett's testimony that he lived on Rosegate Drive and that someone had removed prescription drugs and a garage door opener from his white-topped vehicle was sufficient to connect defendant to the burglary since defendant admitted taking these items from a white vehicle on Rosegate Drive.

16

Finally, defendant contends the record contains insufficient evidence to support the finding that he burglarized a Dodge Durango owned by Scholtz (count 11). Folena drove defendant by a particular residence on Gristmill Drive and defendant stated that he removed $2.00 in coins from a Dodge Durango at that address. Scholtz confirmed that she lived at the residence on Gristmill and that she owned a Dodge Durango. She stated that change was removed from the ashtray in her Dodge Durango and items were taken from her two other vehicles.

Defendant maintains that because he said nothing about removing items from Scholtz's other two vehicles, the evidence was insufficient to show that he removed money from the Durango. We disagree. Defendant admitted removing money from a Dodge Durango parked at a particular address and the owner of the vehicle and resident of that address testified that money was taken from her Dodge Durango. This evidence was sufficient to support the juvenile court's finding that the allegation in count 11 was true.

Accordingly, we strike the findings of petty theft as to counts 3 and 5, and affirm the true findings of petty theft as to counts 4, 8, 9, 10, and 11.

### III. *Jurisdiction*

Defendant argues that the juvenile court lacked subject matter jurisdiction over counts 3, 5, and 9, and claims that the record does not contain evidence that the burglaries occurred in the State of California. (See *People v. Thomas* (2012) 53 Cal.4th 1276, 1283.) As discussed above, we are striking the true findings for counts 3 and 5; thus, we need to address this argument only as to count 9.

Defendant argues that a lack of jurisdiction renders the judgment void, but venue "does not implicate the trial court's fundamental jurisdiction" and venue is not an element of crime. (See *People v. Posey* (2004) 32 Cal.4th 193, 206-208) In any event, defendant's argument lacks merit. Defendant admitted removing items from a white sedan parked at Rosegate Drive in Brentwood. This evidence was sufficient to establish that defendant committed the petty theft in count 9 in California.

17

## DISPOSITION

The true findings as to the petty theft in counts 3 and 5 in the juvenile court's jurisdictional order are stricken.  The jurisdictional order is otherwise affirmed.  The dispositional order is affirmed.

_____
Haerle, J.

We concur:

_____
Kline, P.J.

_____
Richman, J.

18